WILLIAM D. SHIPMAN et al., Respondents, *v.* THE BANK OF THE STATE OF NEW YORK, Appellant.

The relation between a bank and a depositor is that of debtor and creditor, and the law implies a contract on the part of the bank to disburse the money standing to the depositor's credit only upon his order and in conformity with his directions; no payments can be charged against a depositor by a bank unless made to such persons as the depositor directed.

Payments, therefore, made by a bank upon forged indorsements are at its peril, unless it can claim protection upon some principle of estoppel, or because of some negligence chargeable to the depositor.

An account stated by the bank by the balancing and return to the depositor of his pass-book, with the vouchers, can be opened upon proof of fraud or mistake; the silence of the depositor upon receipt of his book thus balanced, unless he is chargeable with *laches*, simply puts upon him the burden of showing the fraud or mistake.

When a bank returns a check, payable to the order of a payee named, to a depositor, as evidence of a payment made by his direction, he has the right to assume that the bank has ascertained that the indorsement upon it is genuine; he is not presumed to know the signature of the payee.

Negotiable paper, the payee of which does not represent a real person, cannot be treated as payable to bearer, unless the paper was put into circulation by the maker with knowledge that the name of the payee does not represent a real person.

In an action to recover money deposited by plaintiffs, a firm of lawyers, with defendant, a banking corporation, it appeared that one department of plaintiffs' business consisted of examining titles, making loans on bonds and mortgages and purchasing real estate for clients; that this business was in charge of B., a competent and trusted clerk of plaintiffs, who received moneys from their clients and deposited them with defendant; the bank account was kept by D., plaintiffs' cashier, who filled out all the checks and presented them to one of the plaintiffs for the firm signature, with statements made by B. as to amounts received and payments to be made. D. compared the checks with the entries in the pass-book, which was frequently balanced, and delivered the checks to B. A large number of checks were paid by defendant upon indorsements of the names of payees written thereon by B., without inquiry on its part as to their genuineness. B. converted the proceeds to his own use. The names of the payees in a portion of these checks were those of fictitious persons; the signatures of the payees upon the others were forged by B. The referee found that plaintiffs, in good faith, through the fraud of B., believed the name given as payee in each of said checks represented the name of a real person entitled to receive the amount of the check in each case, and intended that B. should deliver the check to a real payee therein named and that it should only go into circulation through a delivery to and indorsement by the payee; that plaintiffs were not guilty of negligence, and were entitled to recover. *Held*, no error; that the evidence sustained the findings; and that plaintiffs did or omitted nothing in the general conduct and management of their business or in their employment of and confidence in B. that estopped them from alleging the checks in question were paid without authority; that B., in issuing the false checks and in fabricating the false papers, did not act as plaintiffs' agent, and his acts in this regard were not binding upon them.

*Vagliano* v. *Bank of England* (L. R. [22 Q. B. Div.] 103), distinguished.

It also appeared that some of the checks which were made payable to real persons, the indorsements on which were forged by B., were made good

by him to the several payees, with what funds or in what manner did not appear, and it was not shown that such payments were made at the expense or to the injury of defendant, or that plaintiffs profited by it. It appeared that plaintiffs had paid to clients on account of B.'s frauds more than the amount of the checks in question. Defendant's counsel requested the court to find that plaintiffs not having sustained any loss by reason of such checks was not entitled to recover upon them. This request was refused. *Held*, no error.

(Argued March 12, 1891; decided April 28, 1891.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made January 13, 1891, which affirmed a judgment in favor of plaintiffs entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*William Allen Butler* for appellant. The accounts between the plaintiffs and the bank were accounts stated, binding on the plaintiffs, and cannot be impeached except for fraud or mistake, and the burden of proof was on the plaintiffs to show such fraud or mistake. (*Clark* v. *M. N. Bank*, 11 Daly, 239; *Harley* v. *E. N. Bank*, 76 N. Y. 618; *Lockwood* v. *Thorn*, 11 id. 170.) It was incumbent upon the plaintiffs to examine the pass-book and vouchers when the same were written up and balanced and returned to them from time to time. (*Dana* v. *N. Bank*, 132 Mass. 156; *L. M. Bank* v. *Morgan*, 117 U. S. 96.) Irrespective of the question whether the plaintiffs are concluded by the account stated, they are estopped to claim that the payment by the plaintiffs of the several checks was unauthorized. (*Root* v. *French*, 13 Wend. 570; *Herns* v. *Nicholas*, 1 Salk. 289; *Griswold* v. *Haven*, 25 N. Y. 595; Story on Part. § 168; *Smith* v. *M. & T. Bank*, 6 La. Ann. 610.) The plaintiffs' neglience was the proximate cause of the loss they sustained by the payment of the twenty-seven checks in question. (*Allen* v. *Coit*, 6 Hill, 318; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30, 59, 60; *C. Bank* v. *Bradner*, 44 id. 680, 686; *Durst* v. *Burton*, 47 id. 167.) The

several checks, which were in fact made payable to fictitious payees, were so made payable without knowledge, information or inquiry on the part of the plaintiffs as to the existence or non-existence of the respective payees. They were delivered to Bedell to be put in circulation against supposed specific securities about which no inquiry was made. Plaintiffs took the risk of entrusting the checks to Bedell, and, having done so, are estopped to question the indorsements. (*Cooper* v. *Myer*, 10 B. & Cr. 468 ; *Coggill* v. *A. E. Bank*, 1 N. Y. 113.) The several checks which were made payable to the order of persons having no existence were, in legal effect and under the statute of this state, payable to bearer ; and the plaintiffs put the checks into circulation under circumstances which render them chargeable with knowledge that the payees were fictitious. (1 R. S. 768, § 5 ; *Plets* v. *Johnson*, 3 Hill, 112 ; *Tatlock* v. *Harris*, 3 T. R. 174 ; *Vere* v. *Lewis*, id. 182 ; *Minet* v. *Gibson*, id. 481 ; *Collis* v. *Emmet*, 1 H. Bl. 313 ; *Bennett* v. *Farrell*, 1 Camp. 130 ; *Phillip* v. *Thurman*, L. R. [1 C. P.] 463 ; *F. N. Bank* v. *Leach*, 52 N. Y. 350 ; 1 Daniels on Neg. Inst. § 139 ; *C. Bank* v. *Lang*, 1 Bosw. 206 ; *Griswold* v. *Haven*, 25 N. Y. 595.) As to ten of the eleven checks payable to the order of existing persons, the evidence shows that the plaintiffs sustained no loss, the amounts having been made good by Bedell to the payees. The defense in regard to these checks set up in the answer was established, and the referee erred in refusing to find accordingly. (Code Civ. Pro. § 507 ; *Webster* v. *Bond*, 9 Hun, 437 ; *Sheehan* v. *Hamilton*, 2 Keyes, 304 ; *Dobson* v. *Pearce*, 12 N. Y. 156 ; *Savage* v. *Allen*, 54 id. 458 ; Sedg. on Dam. [6th ed] 614 ; *C. Bank* v. *I. & T. Bank*, 17 N. Y. S. R. 430.)

*Elihu Root* for respondents. Plaintiffs' cause of action rests solely on the bank's contract for the payment of money which it refuses to pay. (*Crawford* v. *W. S. Bank*, 100 N. Y. 53 ; *C. E. Bank* v. *N. Bank*, 91 id. 80 ; *Bank of B. N. A.* v. *M. N. Bank*, Id. 106 ; *F. N. Bank* v. *Whitman*, 94 U. S. 347.) The plaintiffs are not estopped to deny defendant's perform-

ance of its contract by the statements of accounts involved in the balancing of the pass-book and the return of vouchers. (*August* v. *F. N. Bank*, 1 N. Y. Supp. 139.) Plaintiffs are not estopped from denying defendant's performance of its contract by any failure on their part to examine the vouchers returned to them. (*Welsh* v. *G. A. Bank*, 73 N. Y. 424; *Frank* v. *C. Bank*, 84 id. 209; *F. N. Bank* v. *Whitman*, 94 U. S. 347; *L. M. Bank* v. *Morgan*, 117 id. 107; *Vagliano* v. *Bank of England*, L. R. [22 Q. B. Div.] 103.) Plaintiffs are not estopped by any negligence in the general conduct of their business or in supervising Bedell. (Bigelow on Est. 612; *People* v. *Bank of N. A.*, 75 N. Y. 561; *Mayor, etc.*, v. *Bank of England*, L. R. [21 Q. B. Div.] 160; *Vagliano* v. *Bank of England*, 22 id. 103; 23 id. 243; *Weisser* v. *Denison*, 10 N. Y. 68; *Welsh* v. *G. A. Bank*, 73 id. 424; *Frank* v. *C. Bank*, 84 id. 209.) As to all of the defendant's claims to estoppel against plaintiffs (except perhaps with reference to the three checks paid directly over the counter to Bedell), one of the essential elements of an estoppel, viz., loss or damage to the defendant, is entirely wanting. (*C. E. Bank* v. *N. Bank*, 91 N. Y. 80.) The checks drawn to persons who were not in existence were not payable to bearer. (*Turnbull* v. *Bowyer*, 40 N. Y. 456; 84 id. 214; *Weisser* v. *Denison*, 70 id. 60; *A. C. Mills* v. *I. O. M. Co.*, 17 N. E. Rep. 504; *Cave* v. *Cave*, L. R. [15 Ch. Div.] 643.) There is no merit in defendant's claim that Bedell himself made good the amount of some of the checks to the payees. (*Anderson* v. *Kissam*, 35 Fed. Rep. 699.)

O'BRIEN, J. This appeal brings here for review a judgment of over $223,000, recovered by the plaintiffs against the defendant, upon a state of facts fully found and stated by the referee in his report, and in regard to which there is little, if any, serious dispute between the parties. The form of the action is for the recovery of a sum of money which, it is claimed, the defendant undertook, when accepting the plaintiffs' deposits, to pay to them or upon their order and direction.

It has been found, and is admitted on both sides, that on the 7th of April, 1884, the plaintiffs had upon deposit to their credit with the defendant the sum of $14,499.08. That from this date to the close of business, on the 3d day of October, 1888, the defendant had and received, to and for the use of the plaintiffs, various other sums of money deposited from time to time between these dates by the plaintiffs with the defendant amounting in the aggregate to six million, two hundred and thirteen thousand, five hundred and eighty-six dollars and seventy-one cents. That between the 7th day of April, 1884, and the close of business, on the 3d day of October, 1888, the defendant paid to the order of the plaintiffs on their checks, drawn against the balance above stated and the deposits subsequently made, various sums of money amounting in the aggregate to six million, thirty thousand and forty dollars and twenty-nine cents. This would leave a balance due to the plaintiffs by the defendant of one hundred and ninety-eight thousand and forty-five dollars and fifty cents, which, with interest, is the sum that constitutes the subject of this controversy. The defendant alleged in its answer that all moneys deposited with it by the plaintiffs were fully paid upon their order and by checks drawn upon it by them, and in order to meet and disprove the plaintiffs' claim that there was due to them from the defendant at the close of business, on the 3d day of October, 1888, the sum of one hundred and ninety-eight thousand and forty-five dollars and fifty cents, the defendant produced twenty-seven checks, all signed by the plaintiffs and drawn upon the defendant, directing the payment of sums respectively aggregating the total balance above mentioned, and to recover which the plaintiffs brought the action. That the defendant actually paid these checks is not disputed, and the case is thus made to turn upon the question whether they are available to the defendant as lawful vouchers, establishing the fact that the moneys claimed by the plaintiffs were paid out by the defendant upon these checks according to the order and direction of the plaintiffs. A clear understanding of the question involved requires a brief statement of the facts and

circumstances under which the twenty-seven checks were signed by the plaintiffs and presented to and paid by the defendant. The plaintiffs are a well known law firm in the city of New York, engaged in an extensive business which, in its organization, had a department known as the "Real Estate Department." In this branch of their business they examined titles for clients who were lenders of money on bond and mortgage, carried out and completed such loans, and occasionally examined titles for clients who were purchasers of real estate. One of the members of the firm had general charge of this department, but the details of the business and the execution of the work was entrusted to subordinates. One James E. Bedell, a lawyer who had been admitted to the bar in the year 1868, and had been in the employ of the plaintiffs since 1873, assisting in the real estate department, was, in the year 1881, practically put in charge of the work of this department under the direction of the member of plaintiffs' firm who had the general charge. Bedell was an experienced and capable lawyer. The plaintiffs believed that he was honest and trustworthy, and, prior to the discovery of the very extraordinary crimes in connection with these checks, they had no reason whatever to suspect or distrust him. During the period covered by the transactions in question the plaintiffs employed one Dodge, a competent expert book-keeper, who took charge of the plaintiffs' books and acted as cashier. He kept the account between the plaintiffs and defendant. He filled out all the checks and made all the entries in the check-books, and the checks, when paid by defendant, came to him with the pass-book, which was balanced by the defendant, and the vouchers, including the checks in question, returned with the book, from time to time, at frequent intervals. The course of the business in which the checks in question were issued was substantially as follows : The plaintiffs' client who wished to make a loan through them, furnished the money, which went directly into the plaintiffs' general bank account with the defendant. Against the sum to be loaned and thus put to the plaintiffs'

credit checks were filled up by Dodge, the cashier, from a written statement made by Bedell, showing the amount required to pay liens or charges on the property to be mortgaged, the amount of the plaintiffs' charges, and any other items entering into the transaction, and the balance to be paid the borrower. After filling up the checks Dodge would take the check-book, with the filled-up checks, to a member of the firm for signature, showing him the entries in the check-book of the deposit of the client's money and the statement of Bedell as to the payments to be made, and thereupon the check would be signed by the plaintiffs, in the name of the individual partner to whom it was presented by Dodge, the firm name being engraved on each check and the individual signature underwritten. Dodge would then take away the check-book and deliver the several checks to Bedell. In this manner the twenty-seven checks in question were entrusted by the plaintiffs to Bedell, their clerk, for delivery to the payees, respectively, therein named, who were in good faith believed by the plaintiffs to be real persons, entitled to receive the amount of said checks, respectively, from them or their clients. The defendant paid the checks to a third person, upon an indorsement thereon of the payees named, forged by Bedell, who converted the proceeds to his own use. The names of the payees written in sixteen of the twenty-seven checks, drawn for sums aggregating $112,818.72, were not the names of real but fictitious persons. The remaining eleven checks, drawn for sums aggregating $85,227.08, were made payable to the order of real persons, whose indorsements were in every case forged by Bedell. Only three of the checks, drawn for less than $2,400, were paid to Bedell by defendant. All the others were deposited, from time to time, in various other banks in the city of New York, and the money thereon received by Bedell from these banks, and the checks all ultimately paid by defendant through the exchanges in the clearing house, in the due and regular course of business. As to the sixteen checks payable to the order of fictitious persons, the plaintiffs were led by fraudulent contrivances and repre-

sentations on the part of Bedell, the details of which appear in the record, to believe, and they did in fact believe, until the discovery of the forgeries, that such payees were real persons; and as to all the checks, the plaintiffs did not intend that any of them should go into circulation or should be paid by the defendant otherwise than through a delivery to and indorsement by the payee named therein. The checks were paid in every case by the defendant, without any inquiry as to the genuineness of the indorsements, and in reliance upon the responsibility of the parties presenting the same, and not in reliance upon anything done or forborne by the plaintiffs, except that they were signed by them. There is no claim that, at the time the defendant paid the checks, it had any knowledge or suspicion or reason to suspect that any of the indorsements were forged, or that any of the names were fictitious, or that there was any fraud or irregularity in respect to any of the checks or any indorsement or writing thereon. The plaintiffs' confidence in Bedell and his representation of them in all their dealings with clients, concerning loans on real estate, continued without interruption, until one of these clients, upon examining a fabricated mortgage sent to him by Bedell, had his attention arrested by the faintness of the impression of the seal of the register on the certificate of record that he sent the mortgage to the register's office for a better sealing. This led to the discovery of all the frauds, forgeries, fabrications of documents, attestations and official certificates carried on by him in the plaintiffs' office for more than four years. The plaintiffs did not discover that the indorsements on the checks had been forged, or that the amount thereof had not been paid to them or their order, until nearly four months after May 22, 1888, which was the date of the last check so forged. On the discovery of the facts and before the commencement of this action, the plaintiffs tendered the checks to the defendant, and demanded that the amount of the same should be paid to them, or credited in their account by the defendant, which tender and demand was refused.

The various deposits of money made from time to time by

the plaintiffs with the defendant created the relation of debtor and creditor, and the law implies a contract on the part of the defendant to disburse the money standing to the plaintiffs' credit only upon their order and in conformity with their directions. The defendant is not entitled to charge against the plaintiffs' account any sums as payments unless they have been made to such persons as the plaintiffs directed. Such payments as were made without the order of the plaintiffs of their funds by the defendant, afford to it no protection when called upon by the plaintiffs to account for the money deposited. Payments made upon forged indorsements are at the peril of the bank unless it can claim protection upon some principle of estoppel or by reason of some negligence chargeable to the depositor. These rules are so familiar and so well established and illustrated by the adjudged cases that a bare reference to them is all that is needful here. (*Crawford* v. *West Side Bank*, 100 N. Y. 53; *Ætna Nat. Bank* v. *Fourth Nat. Bank*, 46 id. 86; *Corn Exchange Bank* v. *Nassau Bank*, 91 id. 80; *Phœnix Bank* v. *Risley*, 111 U. S. 125; *Bank of British North America* v. *Merchants' Nat. Bank*, 91 N. Y. 106; *Marine Bank* v. *Fulton Bank*, 2 Wallace, 256; *First Nat. Bank* v. *Whitman*, 94 U. S. 347; *Citizens' Nat. Bank* v. *Importers & Traders' Bank*, 119 N. Y. 195.)

The statement of the account made by the defendant to the plaintiffs from time to time, the balancing of the bank passbook and the return of the same to the plaintiffs with the vouchers, including, as they did, the checks in controversy, with the forged indorsements thereon, constitute no obstacle to the maintenance of this action by the plaintiffs as they were ignorant of the facts and circumstances under which the checks were issued and put in circulation. An account thus stated can always be opened upon proof of mistake or fraud, and the only effect of the plaintiffs' silence as to the correctness of the account rendered by the defendant is to put upon them, in this action, the burden of showing that the account, as stated, was the result of fraud or mistake, a burden which they have fully assumed and met, as the referee has found.

It is urged that the plaintiffs owed the duty to the defendant of examining the vouchers returned to them with the balanced pass-book from time to time, and that a careful examination of the same would have disclosed the fact that the money was received upon the checks by Bedell and his forgeries thus detected. The duty of examining the returned vouchers was delegated by the plaintiffs to their cashier and bookkeeper, who was a faithful and competent person for many years in plaintiffs' employ. The referee found as a fact, from all the circumstances of the case, that the failure to discover the forgeries sooner than they were was not, in any case, caused by any neglect on the part of the plaintiffs or their cashier, of any duty that the plaintiffs owed to the defendant. The examination of the checks would, of course, enable the plaintiffs to ascertain whether their own signature was genuine, and whether the amount, date or name of the payee had been changed, but would not necessarily enable them to detect the forgery of the payee's name. The law imposed no duty upon the plaintiffs to do more than they did to ascertain whether the indorsements on the checks were genuine. The defendant's contract was to pay the checks only upon a genuine indorsement. The drawer is not presumed to know, and in fact seldom does know, the signature of the payee. The bank must, at its own peril, determine that question. It has the opportunity, by requiring identification when the check is presented, or a responsible guaranty from the party presenting it, of ascertaining whether the indorsement is genuine or not. When it returns the check to the depositor, as evidence of a payment made by his direction, the latter has the right to assume that the bank has ascertained the fact to be that the indorsement is genuine. ( *Weisser* v. *Denison*, 10 N. Y. 68; *Welsh* v. *German American Bank*, 73 id. 424; *Frank* v. *Chemical Nat. Bank*, 84 id. 209; *First Nat. Bank* v. *Whitman*, 94 U. S. 347; *Leather Mfg. Bank* v. *Morgan*, 117 id. 107.) The plaintiffs committed the examination of the vouchers when returned from the bank to a faithful and competent cashier, who failed to discover the forged indorsements. There

is not the slightest reason to believe that if the checks had been examined by one of the plaintiffs themselves the result would have been any different. We are unable to see that anything was done or omitted by the plaintiffs with respect to the examination of the indorsements upon the vouchers that excuses the defendant from its obligation to pay upon a genuine order only. Nor can we perceive anything done or omitted by the plaintiffs in the general conduct and management of their business, or in the employment of and confidence reposed in Bedell that estops them from alleging that the twenty-seven checks were paid without their authority.

Whether the plaintiffs were guilty of any negligence in that regard was a question of fact and the finding is that they were, in so far as the defendant was concerned, reasonably prudent and careful and that the payment of the checks was not caused by any negligence on their part and we do not think it can be said that this finding is without evidence. Moreover, it is found that the defendant paid the twenty-seven checks, in each case, without any inquiry as to the genuineness of the indorsements, and in reliance upon the responsibility of the persons presenting the same for payment, and not in reliance upon anything done or forborne by the plaintiffs, except the fact that the checks had been drawn by them; and, further, that all the checks except the three paid directly to Bedell, and amounting to less than $2,400, were presented to the defendant by, and paid to banks perfectly solvent, and liable to respond to the defendant for all moneys paid upon the forged indorsements. These findings supported as they are by the evidence, dispose of much of the argument upon which it is sought to establish the proposition that the plaintiffs are, by reason of their own acts and omissions, estopped from claiming that the checks were paid by the defendant without their authority. The facts upon which an estoppel must always be based are found against the defendant. Bedell in issuing the false checks and fabricating the false papers to conceal his crime, did not act as the plaintiffs' agent and his acts in this regard are not binding upon them nor are they in any maner affected by his

knowledge of the facts.   The questions that arise in this case
and are so ably and elaborately discussed in the briefs of coun--
sel, with respect to the examination of the returned checks
and pass-book, the manner in which the plaintiffs' business was
conducted and the degree of care and supervision that was.
exercised over their subordinates, how far the plaintiffs are
bound by the criminal acts and knowledge of their clerk as.
well as the general rule of estoppel, when applied to this class.
of cases, are not new.   They have been frequently and fully
discussed in the numerous cases in this court, involving the
rights and duties of banks and depositors, and it would extend
this opinion beyond reasonable limits, and serve no useful pur-
pose, to go over the ground again.   (*Frank* v. *Chemical Nat.
Bank, supra ; Welsh* v. *German American Bank, supra ;
Weisser* v. *Denison, supra ; People* v. *Bank of N. A.,* 75 N..
Y. 547; *Leather Mfg. Bank* v. *Morgan, supra ; Mayor, etc.,*
v. *Bank of England,* L. R. [21 Q. B. D.] 160.)

It is enough to state our general conclusion that, with respect.
to all these points, the defendant has failed to establish any
defense to the action.

It is claimed by the defendant that the sixteen checks made.
payable to the order of persons having no existence were, in
legal effect, payable to bearer.   It is provided by statute that,
paper made payable to the order of a fictitious person and
negotiated by the maker has the same validity "as against the
maker and all persons having knowledge of the facts, as if
payable to bearer."   (1 R. S. 768, § 5.)

We are of the opinion, upon examination of the authorities.
cited by counsel on both sides, that this rule applies only to
paper put into circulation by the maker with knowledge that,
the name of the payee does not represent a real person.   The
maker's intention is the controling consideration which deter-
mines the character of such paper.   It cannot be treated as.
payable to bearer unless the maker knows the payee to be ficti-
tious and actually intends to make the paper payable to a ficti-
tious person.   (*Irving National Bank* v. *Alley,* 79 N. Y.
536 ; *Turnbull* v. *Bowyer,* 40 id. 456 ; *Vagliano* v. *Bank of*

*England*, L. R. [22 Q. B. D.] 103 ; *S. C.*, on app. 23 id. 243 ; *Armstrong* v. *Pomeroy National Bank*, 46 Ohio St. 512 ; [7 Railway & Corporation Law Journal, 114] ; *Gibson* v. *Minet*, 1 H. Black. 569.)

The findings of the referee that the plaintiffs in good faith believed that the names of the payees represented real persons, entitled to receive from them the amount of the check in each case, having been led to believe this by the fraudulent contrivances of Bedell, and that they intended that Bedell should deliver the check to a real payee therein named and that they did not intend that they should go into circulation or be paid by defendant otherwise than through a delivery to and indorsement by the payee named ; and that plaintiffs gave no authority to Bedell to indorse the name of the payee, or to put the checks into circulation, and that no one in fact relied on any appearance of authority, derived from the plaintiffs, in Bedell to indorse the payee's name upon the checks or to put them in circulation, disposes of this question. The indorsement of the names of the fictitious payees upon the checks, with intent to deceive and to put the checks in circulation, constituted the crime of forgery by means of which, and without any fault of the plaintiffs, payment was obtained thereon. The defendant does not occupy any different position with reference to the checks payable to fictitious payees than it does with reference to those payable to real parties whose indorsements were forged.

Bedell of course knew that the payees were fictitious, but he was not acting within the scope of his employment, but in carrying out a scheme of fraud upon the plaintiffs, and under such circumstances his knowledge cannot be imputed to his principals. (*Frank* v. *Chemical Nat. Bank, supra; Weisser* v. *Denison, supra; Welsh* v. *German American Bank, supra; Cave* v. *Cave,* L. R. [15 Ch. Div.] 643, 644.)

The case presents another and peculiar question. It seems that ten of the eleven checks which were made payable to the order of real persons were made good by Bedell to the several payees, and the defendant has set up these facts in its answer

as a partial equitable defense. The referee made no findings on the subject, but Bedell so testified and was not contradicted, and the question arises upon a request by the defendant to find in substance that the amount of these ten checks having been made good by Bedell to the several payees, the plaintiffs having sustained no loss by reason of the payment thereof, are not entitled to recover in this action against the defendant any sum on account of or by reason of the payment by defendant of the same. The request was refused and the defendant excepted. Keeping in view the theory of this action and regarding the evidence before the referee, we cannot perceive that there was any error in refusing the request.

· Bedell testified, in substance, that at the time of the commencement of the action the plaintiffs were liable to clients to the extent of $264,000 on account of his frauds. There were $200,000 in fabricated mortgages which had been delivered by Bedell to clients on account of an equal sum of money paid by the clients to plaintiffs for investment, and which Bedell had converted to his own use. The $64,000 was obtained through other frauds upon clients which the plaintiffs were liable to be called upon to make good. One of the plaintiffs testified that his firm had actually paid to clients on account of Bedell's frauds over $242,000. It was not shown by what funds or in what manner Bedell made good to the payees the amount of the checks intended for them. None of the money paid by him was traced to the defendant. The plaintiffs' action was not upon the checks, nor for damages by reason of their payment, but on defendant's implied promise to pay the money deposited to the plaintiffs or upon their order. The plaintiffs' case was made out without the checks at all, except so far as they were necessary as proof to open the account stated. In substance the referee was asked to hold that by reason of the payment by Bedell of the amount of the checks to the persons named therein, without any reference to the source from which the money came, they were to be charged to the plaintiffs the same as if paid by their authority. The proof given did not justify this conclusion. As it was not

shown that such payment was made at the expense or to the injury of the defendant, or that the plaintiffs were benefited by it, beyond their whole loss, the cause of action stated in the complaint was not affected by the fact. It is, no doubt, true that payment or indemnity to the payees of checks diverted as these were, made by the wrong-doer, might, under certain circumstances, constitute a basis for equitable relief in an action of this kind, but the proof did not go far enough to warrant it in this case.

The very recent case of *Vagliano* v. *Bank of England* occupied such a prominent place in the discussions of the questions involved in this appeal by the courts below, and it is now so earnestly pressed upon our attention by the learned counsel for the defendant as a controlling authority in support of his views that we consider it necessary to refer to it and point out, so far as we can, the rule or principle which it decides. In the magnitude of the sum involved, the boldness and ingenuity with which a clerk perpetrated a stupendous fraud upon his employer, and, in many other respects, that case, doubtless, bears a very strong resemblance to this. The question there was whether the defendant was entitled to debit the plaintiff, one of its depositors, with forty-three forged bills of exchange, amounting in the aggregate to 71,500 pounds, which it had paid, upon a genuine acceptance by the plaintiff, but procured by fraud under substantially the following circumstances: Vagliano, the plaintiff, was a merchant and foreign banker in London, with correspondents in various parts of the world and transacting an enormous business with the defendant, his general banker. He employed in his office a considerable number of clerks, and among them one Glyka, who had charge of the foreign correspondence. One Vucina, a merchant and banker at Odessa, was, and for thirty years had been, one of Vagliano's correspondents, transacting with him a large business and having practically unlimited credit. For many years he had drawn drafts for large amounts, when necessary, upon the plaintiff, payable sometimes to his own order, but more frequently to the order of a payee named

therein. The course of business in the office was well known to Glyka, who procured specimens of Vucina's letters of advice, which always preceded the drafts, and specimens of the drafts themselves. Having done so he had paper prepared identical in general appearance and texture with that upon which Vucina's genuine letters and bills were written. This enabled him to forge letters of advice and drafts with Vucina's name as drawer, which he executed with extraordinary skill, and in each case he wrote upon the face of the bill, as payees, the name of C. Petridi & Co., a firm who carried on business at Constantinople, and had business relations with Vucina, but had no connection whatever with the fabricated drafts. Glyka caused these forged letters of advice and drafts to be laid before Vagliano, his principal, who, being deceived by the skillful manner in which the papers were prepared and the confidence he reposed in his clerks, wrote a genuine acceptance on the face of each bill as it was put before him from time to time during a period of some four months, payable in every case at the Bank of England. These fabricated bills, having been thus accepted, were placed with the other and genuine bills in a box in the office to be delivered according to the usual course of business to the proper party when called for. Glyka stole the bills from the box, forged the indorsement of the payees thereon, presented them at the counter of the bank and received the money thereon. By the English Bills of Exchange Act of 1882 (45 & 46 Vict. Ch. 61, § 7, subd. 3), it was enacted with reference to bills of exchange, that "where the payee is a fictitious or non-existing person, the bill may be treated as payable to bearer." The bank defended upon two grounds — first, that they were protected by this statute, and secondly, that the plaintiff was guilty of such negligence as precluded him from claiming that the payments made upon these bills were without authority. On the trial of the action before Mr. Justice CHARLES, the plaintiff recovered. (L. R. [22 Q. B. D.] 103.) On appeal, the judgment was affirmed, the master of the rolls alone dissenting, on the ground that the bank was protected by the Bills of

Exchange Act. (L. R. [23 Q. B. D.] 243.) Thus far the
views of the court on both hearings were in harmony with the
contention of the plaintiffs in the case at bar, both as to
the construction of the statute and the facts bearing on the
question of negligence. The judgment, however, has recently
been reversed by the House of Lords, and we have been fur-
nished with copies of the opinions given upon the final decision
of the appeal, and have given to them the careful considera-
tion which the high authority of the tribunal from which they
emanate and the importance of the case seems to demand.
The main point upon which the case turned in the review by
the House of Lords, as we understand the opinions, was the
construction to be given to the Bills of Exchange Act. It
was held, contrary to the opinions below, that whenever the
name inserted as payee is without any intention that payment
shall be made only in conformity therewith, the payee then
becomes a fictitious person within the meaning of the act, and,
therefore, the forty-three bills were within the statute, though
Petridi & Co. were in fact existing and real persons. When
this conclusion was reached, the plaintiff's case necessarily
failed, as it was but another way of stating that the bank paid
the fabricated bills according to their legal tenor and effect
and according to the plaintiff's directions, that is, to bearer.
It is hardly necessary to add that if we could follow that case
in giving construction to our statute, the same result would
follow in this case. But it is quite obvious that we cannot.
The language is different. Our statute is a codification of the
common law, while the English statute is, and was intended to
be, a departure from it. In so far as the opinions deal with
the facts of the case upon the question of negligence, it is dif-
ficult to deduce from them any abstract rule or principle.
Moreover, there is, as it seems to us, a material difference in
some respects between the facts of that case and the one at
bar. Vagliano, through the contrivances of his clerk, had put
before him a fabricated bill, the spurious character of which
he failed to detect, and he fixed to it a genuine acceptance,
thereby accrediting it to the bank as a genuine instrument.

He left the bill thus accepted in a place where the dishonest clerk could easily purloin it. The manner in which the business was conducted was such as to enable the clerk to possess himself of the means whereby the fraud was successfully carried out without check or detection. The view of the case taken in the opinions delivered in the House of Lords, aside from the question of the construction of the statute, may very well be attributed to a different shading in the facts, and to the further consideration which can be inferred from the record, that that tribunal is not confined, as we are, to a review of the courts below upon questions of law only. For these reasons, the *Vagliano* case cannot be regarded as authority adverse to the conclusion at which we have arrived in this. We have examined the other exceptions appearing in the record to which our attention has been directed, and we are of the opinion that none of them can be sustained.

The judgment should be affirmed.

All concur, GRAY, J., in result.

Judgment affirmed.