CHARLES A. DANIELS, Plaintiff, *v.* CORN EXCHANGE BANK TRUST COMPANY, Defendant, and AMALGAMATED BANK OF NEW YORK and Another, Defendants, Impleaded.

Municipal Court of New York, Borough of Manhattan, Ninth District, June 30, 1932.

*Bokor & Epstein [E. M. Bokor of counsel], for the plaintiff.*

*Laughlin, Gerard, Bowers & Halpin [Francis S. Quinn of counsel], for the defendant Corn Exchange Bank Trust Company.*

*Stewart Maurice, for impleaded defendants.*

LEWIS, DAVID C., J.   The plaintiff, a New York business man, the comptroller of the General Bronze Corporation, was solicited on the telephone by a stranger describing himself as Gibson, the customers' man for one R. C. Montgomery, a high-class investment house, member of the New York Stock Exchange.

Up to this time the plaintiff had never heard of, seen or spoken to Gibson, or apparently R. C. Montgomery.   In fact, the plaintiff never came face to face with either of them.   These telephone communications between the alleged Gibson and the plaintiff constituted their sole intercourse.

About September 30, 1931, Gibson (by phone) offered 200 shares of General Bronze Corporation stock to the plaintiff, stating it would be necessary for the plaintiff to give a deposit to open the account.

Thereupon this plaintiff inquired of Gibson for references.   Gibson named the Chemical National Bank.   Upon inquiry, the bank advised the plaintiff that Robert Craig Montgomery carried an account with them and was a person of the highest standing.   The plaintiff concluding to proceed with the purchase, then examined the telephone book, to verify Montgomery's name, and noticed that the telephone number which had been given by Gibson was different from the listing in the book.   On calling up the number which Gibson had given, the plaintiff inquired of the operator about this difference, and was advised that Montgomery had only recently come there.

The plaintiff had arranged with Gibson to make part payment by giving a check to a messenger; upon delivery of the stock the balance was to be paid.

Pursuant thereto, a Western Union messenger called and Daniels delivered to him the check, payable to Robert C. Montgomery, obtaining in return a receipt signed " S. W. Robert C. Montgomery."

The plaintiff did not receive the stock; and subsequently, upon inquiry, ascertained that the alleged Gibson and Montgomery had apparently disappeared; that the real Robert Craig Montgomery had never had any transactions with the plaintiff, had never employed Gibson, was never located at the office where the alleged Gibson and Montgomery apparently held forth; that the real Robert Craig Montgomery had known nothing about the transactions, and had never seen or received the check nor indorsed the same, and that both the alleged Gibson and Montgomery were impostors.

There are certain unquestioned and established principles express-ing the settled law of our State which narrow the problem now presented to one of intent. Hence, intent is the essential question presented. Find the intent of the maker (the plaintiff), and we find the road to a solution of this problem.

The decisions of the Court of Appeals, in dealing with this query, may reflect a change in policy, but not in principle. (See *Ulmann* v. *Central Union Trust Co. of N. Y.*, 257 N. Y. 563, overruling *Hartford* v. *Greenwich Bank*, 157 App. Div. 448; affd., 215 N. Y. 726. See, also, *Strang* v. *Westchester County Nat. Bank*, 235 id. 68; *United Cigar Stores Co.* v. *American Raw Silk Co., Inc.*, 184 App. Div. 217; affd., 229 N. Y. 532.)

So in the case before the court. The plaintiff never intended to make Gibson the payee of the check, for Gibson specifically stated he was the customers' man for one Montgomery. If there was a person posing as Montgomery, the employer of Gibson, no matter how fraudulent may have been the deception practiced upon this innocent plaintiff, neither such deception nor the ensuing misfortune would visit liability upon the bank by reason of its payment of the check so long as it bore the indorsement of the so-called Montgomery.

In lucid language the former chief judge of the Court of Appeals explains the rule. " The plaintiff did not intend to deal with Bushnell, either under that name or any other. She did not know Remsen, who was represented to be the owner, but she knew that he was not Bushnell, *for Bushnell so informed her.* * * *

" The plaintiff did not loan her money to Bushnell, content to accept him as a borrower. He of all men was excluded. She loaned it upon the bond of Homer and Alice Remsen, with a mortgage as collateral. *Undoubtedly, she believed, when she drew her check upon the bank, that Remsen was an owner of the property,* * * * This belief did not mean that someone else who had been expressly excluded as a borrower, had the right, because he was the owner, to step into the borrower's shoes. Remsen, if a real person, might have endorsed the draft without liability as a forger, however fraudulent the statement that he was the owner of the land. (*Phelps* v. *McQuade* [220 N. Y. 232].) Bushnell, having asserted that the borrower was some one other than himself, was not at liberty to endorse, whether he was the owner of the land or not." (*Strang* v. *Westchester County Nat. Bank*, 235 N. Y. 68, at pp. 71, 72.)

" It is unnecessary to decide whether a different result would be required if the appellant had delivered the checks personally and had determined for himself the identify of the payee, which would present the question as to who was intended as the payee

in a somewhat different aspect and might give rise to a question of estoppel." (*Mercantile National Bank* v. *Silverman*, 148 App. Div. 1, 6; affd., 210 N. Y. 567.)

This case is cited with approval in *United Cigar Stores Co.* v. *American Raw Silk Co., Inc.* (*supra*).

While the defendant would have the court ignore the distinction between a case where the deception was the result of transactions in person and where the deception was accomplished through the mail, the court believes that unless uncontrovertible equities prohibit or extremely different conditions are presented, it should as a matter of judicial wisdom follow in the path of precedent, " especially as we deem the rule  *  *  *  more reasonable and sound than the one adopted in the cases in the other jurisdictions." (*Mercantile Bank* v. *Silverman, supra,* at p. 6.)

This distinction between personal transactions had face to face with the defrauder, and impersonal transactions, where the guilty culprit does not appear upon the scene, may be immaterial except upon the question of intent; but it is a distinction well rooted in the law of the land.

" The fact that the vendor deals with the person personally rather than by letter is immaterial, except in so far as it bears upon the question of intent.

" Where the transaction is a personal one the seller intends to transfer title to a person of credit, and he supposes the one standing before him to be that person.   He is deceived.   But in spite of that fact his primary intention is to sell his goods to the person with whom he negotiates.

" Where the transaction is by letter, the vendor intends to deal with the person whose name is signed to the letter.   He knows no one else.   He supposes he is dealing with no one else.   And while in both cases other facts may be shown that would alter the rule, yet in their absence, in the first title passes, in the second it does not." (*Phelps* v. *McQuade*, 220 N. Y. 232, at pp. 234, 235.)

If we may borrow further from the learned opinion of the court in the *Phelps* case, we find the distinction explicitly emphasized by a quotation the court has culled from the case of *Edmunds* v. *Merchants' D. T. Co.* (135 Mass. 283).   Treating of the instance where a swindler personally represents himself to be some one else, we read: " ' He could not have supposed that he was selling to any other person; his intention was to sell *to the person present, and identified by sight and hearing;* it does not defeat the sale because the buyer assumed a false name, or practiced any other deceit to induce the vendor to sell.' "

In the *Phelps* case the learned court proceeds to contrast such

holding with the decision in the case of *Cundy* v. *Lindsay* (L. R. 3 App. Cas. 463), involving an instance where a purchaser procured merchandise, signing himself as Blenkiron & Co., stating: " The latter shipped the goods to Blenkiron and Company. They knew of the firm of Blenkiron and Son; believed the letter came from that firm and that the goods were shipped to it. Blenkiron and Son were the persons with whom Lindsay & Co. *intended* to deal and supposed they were dealing. Under those circumstances it was held that although Blenkarn obtained possession of the goods, he never acquired title."

Further treating on the subject, the court writes: " Another class of cases, such as *Hentz* v. *Miller* (94 N. Y. 64) and *Consumers Ice Co. of Buffalo* v. *Webster, Son & Co.* (32 App. Div. 592), illustrate the rule under different circumstances. In them, the persons falsely stating that they are the agents or representatives of others fraudulently obtained possession of goods under pretense of sale to such others. There is no intention on the part of the vendor to sell to the pretended agent or representative and no title passes." (*Phelps* v. *McQuade, supra,* at p. 236.)

In passing, it might be noticed that the Court of Appeals in its opinion also cites as a supporting authority the case of *Mercantile National Bank* v. *Silverman (supra)*.

What warranty has this court to add further to the existing distinctions in law, by differentiating a false representation made by an alleged agent through the telephone from a false representation through the mail, simply because in one instance the subject of the transaction is merchandise and in the other a check?

Somewhere in the chain of events there comes a face to face meeting with the person signing the payee's name (or, at least, with his agent) by one who knows or should know and identify the payee. And a like situation may arise when the paper, for real value, is actually negotiated, or cashed.

Should we not look to these stages of personal encounter to trace and place responsibility, rather than as a matter of abstract principle impose it on the maker who not infrequently is ignorant of the payee's signature, without ready facilities or opportunity to verify it, and innocent of wrong or neglect?

" The various deposits of money made from time to time by the plaintiffs with the defendant created the relation of debtor and creditor, and the law implies a contract on the part of the defendant to disburse the money standing to the plaintiffs' credit only upon their order and in conformity with their directions. The defendant is not entitled to charge against the plaintiffs' account any sums as payments unless they have been made to such persons as the

plaintiffs directed. Such payments as were made without the order of the plaintiffs of their funds by the defendant, afford to it no protection when called upon by the plaintiffs to account for the money deposited. Payments made upon forged indorsements are at the peril of the bank unless it can claim protection upon some principle of estoppel or by reason of some negligence chargeable to the depositor. These rules are so familiar and so well established and illustrated by the adjudged cases that a bare reference to them is all that is needful here. [Citing cases.] * * *

" The law imposed no duty upon the plaintiffs to do more than they did to ascertain whether the indorsements on the checks were genuine. The defendant's contract was to pay the checks only upon a genuine indorsement. The drawer is not presumed to know, and in fact seldom does know, the signature of the payee. The bank must, at its own peril, determine that question. It has the opportunity, by requiring identification when the check is presented, or a responsible guaranty from the party presenting it, of ascertaining whether the indorsement is genuine or not. When it returns the check to the depositor, as evidence of a payment made by his direction, the latter has the right to assume that the bank has ascertained the fact to be that the indorsement is genuine." (*Shipman* v. *Bank S. N. Y.*, 126 N. Y. 318, at pp. 326–328.)

Who did sign and indorse the name of Montgomery to the check remains a mystery so far as the proof here presented evidences.

Without a genuine indorsement the bank had no right to pay the check; hence no right to surcharge or debit the plaintiff's account with it.

Judgment for the plaintiff.

Ten days' stay.