## FIDELITY & DEPOSIT CO. OF MARYLAND v. UNION TRUST CO. OF ROCHESTER, N. Y.

### Law No. 1752A.

District Court, W. D. New York.

Jan. 3, 1941.

**4**

Raines & Raines, of Rochester, N. Y., for plaintiff.

Harris, Beach, Folger, Bacon & Keating of Rochester, N. Y. (Kenneth B. Keating, of Rochester, N. Y., of counsel) for defendant.

BURKE, District Judge.

This suit involves three separate drafts drawn by the London Guarantee and Accident Company, Ltd., hereinafter called London, in payment of three separate fraudulent accident claims. O'Connell, an adjuster for London, conspired with one Kauffman, a doctor, and others to arrange for and present fraudulent claims for damages based upon faked automobile accidents. O'Connell in each case reported the result of his supposed investigation of the accident to his company with his recommendation for settlement and obtained authority for settlement in certain specified amounts. Pursuant to said authority he issued drafts in settlement of the claims. The drafts were signed in the name of London by O'Connell. One of the drafts was issued to James Giambrone and Josephine Giambrone in the amount of $2,500, another to the order of Donald Gilbert in the amount of $300 and another to the order of Sally Johnson in the amount of $1,200. As to the Giambrone draft the facts are in dispute as to whether it was endorsed by either of the payees. In the case of the other two drafts, the names of Donald Gilbert and Sally Johnson were assumed names used by actual but fraudulent claimants in the scheme of fraud and the names were assumed to further the purpose of the fraud. They did, however, concededly endorse the drafts using their assumed names. All of the drafts were endorsed by Kauffman and deposited by him in the defendant bank where he had an account. The defendant bank then endorsed the drafts with the endorsement: "Pay to the order of any bank, banker, or trust company. All prior endorsements guaranteed". It then sent the drafts to its forwarding agent in New York for collection. The drafts were paid in due course. O'Connell and Kauffman were convicted of grand larceny based upon their acts in connection with these faked claims and others. The plaintiff, Fidelity and Deposit Company of Maryland, had issued to London a fidelity bond covering its employees. By reason of its obligation on the bond it paid London an amount in excess of the total amount involved in these drafts. The amount as so paid covered other deficiencies of O'Connell and included the amounts in consideration here. The plaintiff now sues as subrogee to the rights of London to recover the amount of the three drafts claiming that they were all forged endorsements.

The disputed questions of fact regarding the endorsement of the Giambrone draft by the payees are resolved in favor of the plaintiff. In my opinion Kauffman's testimony is not entitled to credence. The evidence establishes that James Giambrone was able to write and to sign his name but that Josephine Giambrone was not. Kauffman's story that he had them had them practice signing their names for fifteen or twenty minutes before endorsing the drafts, is fantastic and does not square with practicality. According to Kauffman, when Josephine Giambrone signed the draft her hand was guided by Anna Polumbo, who was not available as a witness at the trial. The evidence convinces me that neither of the Giambrones endorsed the draft but that Kauffman signed their names to it.

Frank Graves and Bernice Levin were engaged with O'Connell in the scheme to defraud the insurance company. To further their purpose and to conceal their identities, they assumed the names of Donald Gilbert and Sally Johnson respectively. Their negotiations and the drafts in settlement of their fraudulent claims were issued to them in their assumed names and endorsed by them under those names. They were real persons although they were using aliases to aid them in their fraudulent scheme. The intent of the drawer of the draft should govern in determining whether there was a forgery. London intended to authorize drafts to be issued to the persons calling themselves "Gilbert" and "Johnson". True the authorization was procured by fraud but the defendant is not responsible for that. It is only responsible

if the endorsements of the payees were forged. If Graves and Levin had made claims in their real names and the drafts had been issued to Graves and Levin, although the authorization was procured by fraud in the same manner as appears here, it seems clear that there would have been no forgery and that the bank would not be liable. The rule that the intent of the drawer should govern is not altered by the fact that they used aliases instead of their real names. "Gilbert" and "Johnson" were known to London as such in their negotiations for settlement. They had filed their claims under such names. London intended to issue drafts to "Gilbert" and "Johnson" in settlement of those claims. London intended to pay the persons who filed the claims. "In determining whether there was a forgery, the true test is whether or not the indorsement of the name of the payee was made by the person who was intended by the drawer to be the payee. If such person indorsed, there is no forgery". Halsey v. Bank of New York, 270 N.Y. 134, 138, 200 N.E. 671, 673. See also Cohen v. Lincoln Savings Bank, 275 N.Y. 399, 403, 10 N.E.2d 457, 112 A.L.R. 1424.

"Although one may be deceived as to the name of the man with whom he is dealing, if he dealt with and intended to deal with the visible person before him the check may properly be indorsed by the impostor". Halsey v. Bank of New York, supra, cited in Cohen v. Lincoln Savings Bank, supra. London, although induced to do so by fraud, dealt with "Gilbert" and "Johnson" as claimants and authorized O'-Connell, in its name, to issue drafts to them. In the Cohen case, where the plaintiff was granted judgment on the ground that the endorsement of an impostor was a forgery, the court held that there was no antecedent fraud by which the plaintiff was induced to deal with the impostor. The rule is definitely established that "only a payee named in the instrument or identified by previous dealings and intended to be described by that name can transfer title to the instrument". Cohen v. Lincoln Savings Bank, supra. Applying that rule to the case at bar "Gilbert" and "Johnson" could transfer title to the drafts because they were identified by previous dealings with London and intended by London to be described by those names in the drafts issued to them.

In Shipman v. Bank of State of New York, 126 N.Y. 318, 27 N.E. 371, 12 L.R. A. 791, 22 Am.St.Rep. 821, the defendant paid the checks to a third person, upon an endorsement thereon of the payees named, forged by Bedell, an employee, who converted the proceeds to his own use. This case involved twenty-seven checks. In sixteen of those the names of payees were not the names of real persons. As to those checks the plaintiffs were led by fraud on the part of Bedell, an employee, to believe that such payees were real persons. In fact the payees had no existence. In each case the endorsement was forged by Bedell. The fact that the payees were non-existent distinguishes it from the case at bar where the payees were real persons but were known to London in its dealings with them by assumed names. In United Cigar Stores Co. v. American Raw Silk Co., 184 App.Div. 217, 170 N.Y.S. 480, the check in question was payable to the order of Lieutenant Parks. It was delivered by the defendant to Peterson with instructions to deliver it to Parks for the purpose of being used as a donation to a charitable fund. There was no such person as Parks. Peterson was an impostor. He procured payment of the check after having endorsed "Parks" name thereon. This is clearly a case of a non-existent payee. So also is Strang v. Westchester County National Bank, 235 N.Y. 68, 138 N.E. 739, 740. There the draft in question was endorsed by Bushnell, a lawyer, in the name of Remsen, the payee. There was no such person as Remsen. There Judge Cardozo wrote: "A different case would be here if the plaintiff had dealt with Bushnell in the belief that he was Remsen, intending to make payment to the person there before her, though lured into that intention by his assumption of a fictitious name. In such circumstances, nice distinctions would have to be drawn to determine whether the crime was forgery or something else." Hartford v. Greenwich Bank, 157 App.Div. 448, 142 N.Y.S. 387, affirmed in 215 N.Y. 726, 109 N.E. 1077, is distinguishable from the case at bar. There the court held the endorsement not to be a forgery. This case was expressly over-ruled by the Court of Appeals in Ulmann Co. v. Central Union Trust Co., 257 N.Y. 563, 178 N.E. 796, on the authority of Strang v. Westchester County National Bank, supra and United Cigar Stores Co. v. American Raw Silk Co., supra. In that case the plaintiff's assignor, the Great Atlantic & Pacific Tea Company, had an employee named Rypinski. Through Rypinski's fraud the compa-

ny was induced to believe that it had purchased merchandise from James Wilson. Rypinski had used the name of Wilson on bill-heads to induce the company to believe that it owed Wilson money. Checks for the merchandise were made payable by the company to Wilson. Rypinski endorsed the checks in the name of Wilson. There was no person who had any dealings with the tea company in inducing it to make the checks payable to Wilson except Rypinski, its own employee. It can hardly be said that the tea company intended to make checks for merchandise payable to the order of its own employee. Other than its own employee, there was no person in existence as the payee of the checks. The cases cited as authority for overruling Hartford v. Greenwich Bank, supra; Strang v. Westchester County National Bank, supra, and United Cigar Stores Co. v. American Raw Silk Co., supra, seem to point to the fact that that was the reason for overruling it, namely, that there was no such person calling himself Wilson except the employee who procured the fraud. The facts are quite different in the case at bar. "Gilbert" and "Johnson" were actual persons using assumed names who had filed claims and had gone through the fraudulent practice of being examined in connection with the claims.

■ It had been the practice of London for some years to make its drafts in settlement of claims payable at the Chemical Bank and Trust Company of New York. When these drafts came in through the clearing house, they were sent by the Chemical Bank to the New York office of London. London then examined them and sent a check each afternoon to the Chemical Bank to cover the drafts accepted by London. The drafts that were refused were returned to the Chemical Bank with a notation as to the reason for refusal. The accepted drafts were then paid by the Chemical Bank, not out of London's money held by the Chemical Bank as a depositor, but out of the proceeds of particular checks sent by London for the particular purpose of paying the accepted drafts. Under such practice London was the drawee. The Chemical Bank was merely the place or agency through which London paid its drafts. When the Chemical Bank paid the drafts, it paid them only after London had accepted them, had furnished funds for the particular purpose of paying them, and had instructed the Chemical Bank to pay. It was not acting as a debtor of London in making payment. London, by having accepted the drafts for payment and having furnished funds to the Chemical Bank for payment, is not estopped from recovering from the defendant on its endorsement, if the endorsements of the payees were forged. The obligation of the defendant on its endorsement ran to London as the drawee. New York Negotiable Instruments Law, Consol.Laws, c. 38, Section 350-c.

■ On the trial the plaintiff relied on secondary evidence to prove the coverage for O'Connell's defalcations at the time the drafts in question were issued and paid. The failure to produce the original bonds and schedules of coverage was reasonably explained. The admission of secondary evidence as to their contents was justified under the circumstances. The evidence fairly establishes that plaintiff was liable on its fidelity bonds issued to London for O'Connell's defalcations. Its Excess Commercial Blanket Bond became effective February 1, 1931, prior to all the transactions in question here, and the coverage afforded thereby was far in excess of the amounts involved here.

■ Plaintiff paid on account of its liability on fidelity bonds issued to London $12,622. The entire amount was for O'Connell's defalcations. Plaintiff has recovered $2,930 as a result of legal proceedings brought against O'Connell based on his fraudulent transactions. The defendant contends that the amount that plaintiff recovered against O'Connell must be regarded as a set-off against any judgment recovered against the defendant. Yanowe & Co. v. American Exchange Irving Trust Co., 226 App.Div. 530, 234 N.Y.S. 603, 604, cited by defendant, does not sustain its position. In that case the forger had paid the proceeds of three of the forged checks to the plaintiff who sought recovery from the defendant. There the court held the defendant was entitled to credit for the amounts so paid and in so holding said: "Shipman v. Bank of State of New York, 126 N.Y. 318, 27 N.E. 371, 12 L.R.A. 791, 22 Am.St.Rep. 821, relied on by the respondent, is not an authority to the contrary. There the forger had been guilty of many collateral frauds; he had made some payments from the proceeds of these frauds to creditors of the plaintiffs; but, in the language of O'Brien, J.: 'It was not shown by what funds or in what manner Bedell made good to the payees the amount of the checks intended

for them. None of the money paid by him was traced to the defendant.' For that reason it was held that the defending bank could not demand the application of these payments against that portion of the plaintiffs' loss for which it was responsible. The averment in the case at bar, however, is that the identical money received by the forger from the bank was turned over to the payee. The plaintiff benefited by these payments to its creditors. It had the same advantage from them that it would have had if the checks had been directly paid to the named payees. If the affidavit of the forger is assumed to be true, the plaintiff should not be allowed to recover from the bank the very moneys which have already been applied to its use." Here there is no suggestion that the moneys recovered from O'Connell as a result of legal proceedings against him were the identical moneys that he received as a result of his fraudulent transactions. In fact, the opposite conclusion is the only reasonable one.

Plaintiff is entitled to recover from the defendant the amount of the Giambrone draft with interest from the date that it paid the loss. Submit findings and conclusions in accord herewith on notice.