principle is recognized in the case of *Mott* v. *Ackerman* (92 N. Y., 539). It was there held that where the power granted, or the duty involved implied a personal confidence reposed in the individual over and beyond what is ordinarily implied by the selection of an executor, the power and duty are not those of an executor *virtute officii,* and do not pass to an administrator with the will annexed.

In the case at bar, the power of sale was conferred upon these individuals as individuals, and not as executors, and a discretion was reposed in them which could be exercised by nobody else. It, therefore, would seem that, by the conveyances executed by the surviving executor, a complete title was vested in the grantee of those deeds.

The judgment should be reversed and a new trial ordered, with costs to appellant to abide event.

Lawrence and O'Brien, JJ., concurred.

Judgment reversed and new trial ordered, with costs to appellant to abide event.

---

JOHN E. PHILLIPS, as Receiver of THE NATIONAL BANK OF SUMTER, South Carolina, Appellant, *v.* THE MERCANTILE NATIONAL BANK OF THE CITY OF NEW YORK, Respondent.

*Liability of a bank on its draft or check — fictitious payee — effect of using a name similar to that of a known person.*

The principle that a bill or check made to a fictitious payee by the drawer knowingly and put in circulation, indorsed accordingly, is the same as though made payable to the bearer, applies when the name inserted and indorsed as payee is similar to that of a known person, but is used by the drawer with no intention that such person should become a party to the paper in any way.

Hence, if a bank official, authorized to draw bills and checks for his bank, draws a check upon another bank with which his bank has an account, and, to avert suspicion, and with no intention of delivering the check to the payee, inserts as payee a name similar to that of a customer of the bank, and indorses the check in that name to a third party, to whom he delivers it, and it is then indorsed by such indorsee and thereupon paid by the bank on which it is drawn out of funds of the drawer bank in its hands, and there is nothing in the transaction to put the drawee upon inquiry, the drawer bank is properly chargeable with the amount thus paid and cannot compel repayment from the drawee bank.

Appeal by the plaintiff, John E. Phillips, as receiver, etc., from a judgment, entered in the office of the clerk of the city and county of New York on the 27th day of May, 1892, upon a dismissal of the complaint at the New York Circuit. ·

The action is brought by the receiver of the National Bank of Sumter, South Carolina, to recover with interest $20,326.77, an alleged balance due on its deposit account with the defendant, and also to recover $212.78 alleged to have been paid by the receiver to the defendant as dividends by mistake of fact. The answer alleges the payment of the amount claimed upon thirteen checks duly drawn by the National Bank of Sumpter, their dates ranging between January 25, 1886, and January 31, 1887, and as a second defense a stated and settled account between the Sumter Bank and the defendant, after the payment of all such checks and their return to the Sumter Bank, and that on such account there was due to the defendant $265.98, which the defendant filed in proof with the receiver; the plaintiff as receiver allowed the same, and paid to the defendant on account thereof the amounts alleged as dividends in the complaint.

The subject-matter of the controversy is twelve of the thirteen checks mentioned in the answer; one of the checks, namely, that of December 10, 1886, for $5,125.25 having been withdrawn from the plaintiff's claim.

It appears from the evidence that on Monday, August 22, 1887, the National Bank of Sumter was compelled to suspend payment on account of insolvency, its cashier, C. E. Bartlett, having absconded the Saturday night previous, and on August twenty-fourth the plaintiff was appointed receiver, and assumed charge of the bank as such about the 5th or 6th of September, 1887; that shortly thereafter the defendant made a claim against the Superior Bank for an overdraft of $265.98, and that $212.78 was paid on said claim. Four or five months after the cashier's flight the checks referred to were discovered in the bank, drawn by Bartlett as cashier upon the defendant, seven to the order of A. S. Brown and six to the order of C. E. Stubbs, who, it appears, were residents of Sumter and customers of the defunct bank. Bartlett would enter on the stubs of these checks the date, name of the payee and the amount, sometimes the same as the check and sometimes only a tenth of the same.

After these were posted into the ledger by the bookkeeper, Bartlett altered the entries in the stubs and in the ledger, in the case of the false amounts, by adding a figure, to make them correspond with the checks actually drawn. These checks were all indorsed, " Pay to the order of Cumming & Russell " (or " E. A. Bigelow & Co.," or " Latham, Alexander & Co."), and the name of the payee " C. E. Stubbs " or " A. S. Brown," which indorsements it was stipulated between the parties were made by Bartlett; both Stubbs and Brown testifying that the indorsements were not made by them, but were fair imitations of their handwriting, and were made without their knowledge or authority, and that the first either of them saw of the checks was some months after the cashier's flight. Bartlett would then forward the checks to the indorsees, who indorsed them " for deposit," and deposited them in their bank, which indorsed and collected them from the defendant, and the latter in turn charged them to the Sumter Bank and returned the vouchers.

At the close of the plaintiff's case, upon motion of defendant's counsel, the trial judge dismissed the complaint rendering an oral decision, and from the judgment entered thereupon this appeal is taken.

*George W. Wingate,* for the appellant.

*John M. Bowers,* for the respondent.

O'Brien, J. :

The question thus presented is, as stated by the learned trial judge, was the Sumter Bank bound by the act of its cashier in drawing the checks and indorsing them and putting them in circulation so indorsed ?

It may serve us in reaching a conclusion upon this question if we first determine what would have been the position of the Sumter Bank, assuming that the checks had been drawn directly to the order of Cumming & Russell, or E. A. Bigelow & Co., or Latham, Alexander & Co., through whom they were presented to the defendant.

It was the duty and within the scope of the authority of the cashier to draw bills or checks, and though he had drawn them for his own purposes, intending to defraud his bank, no question could arise but that the payment of such checks, properly indorsed, out of the funds of the Sumter Bank in the hands of the defendant

would be a good payment, unless there was something in the transaction tending to put the receiver of the checks upon inquiry.

Again, if we assume that the names of the payees subsequently indorsed on the checks were fictitious names, knowingly made by the cashier and indorsed by him, this would, in effect, be the same as though the bill or check was payable to bearer, and if, as in this case, subsequently indorsed and presented to defendant and paid out of funds of the plaintiff, the latter could not compel a repayment.

Whether another and different rule is to be applied has been narrowed down to, and necessarily depends upon, the circumstance that the names of the payees which were indorsed on the checks were similar to names borne by customers of the bank. The facts are susceptible, of course, of but one inference, that at the time these names were inserted by the cashier he had no idea of delivering the checks to them, nor were their names used for any purpose other than to ward off the suspicion which might otherwise arise, or the discovery which might follow an examination by other officers of the bank if checks were drawn in names that were strange to such officers. The purpose in drawing the checks was to place them in the hands of the three firms to whom, after indorsing them, the cashier sent them. In other words, the object of the drawer was to put the drafts in circulation with the names of the payees indorsed upon them; and whether such payees were purely fictitious or were similar to the names of persons whom the cashier may have known and used, instead of creating new ones, does not seem to us to change the principle that should be applicable upon the facts presented.

As said in Daniel on Negotiable Instruments ([4th ed.], § 140): "If the bill or note be payable to some person who had no interest in it and was not intended to become a party to it, whether such person is or is not known to exist, the payee may be deemed fictitious." And the same author continues: "But, if it be payable to some person known at the time to exist and present to the mind of the drawer when he made it, as the party to whose order it was to be paid, the genuine indorsement of such payee is necessary in order to a recovery thereon by an indorsee, even though he had no interest in it and the drawer knew that fact." As stated by the learned trial judge: Bartlett, "as cashier, was authorized to draw the bills. That was within his power.  *  *  *  When he drew the draft he

acted as cashier." And, again : " The intent of the cashier was the intent of his bank; that is, so far as the New York Bank was concerned."

That these views are correct must be apparent from a considera· tion of the relation of the person drawing the checks to the bank and the principle applicable thereto which must obtain that his act was the act of the bank. Having authority, therefore, to put in circu- lation the checks, the bank cannot escape liability, because, in putting such checks or bills in circulation with the names of the payees indorsed upon them, he adopted, with a view to allay the suspicion of the bank's officer, the device of selecting names which were similar to those of persons with whom such officers were acquainted.

Much stress is placed by appellant upon the case of *Shipman* v. *Bank of the State of New York* (126 N. Y., 318). That was a case of forgeries by a trusted clerk of principals who delivered to him checks which they had intended to draw to actual payees, but, through the fraud and connivance of the clerk, were drawn to payees, some of whom were real and some fictitious. It was therein held that negotiable paper, the payee of which does not represent a real person, cannot be treated as payable to bearer, unless the paper was put into circulation by the maker, with knowledge that the name of the payee does not represent a real person. And, in the course of the opinion, the court says : " The maker's intention is the controlling consideration which determines the character of such paper. It cannot be treated as payable to bearer, unless the maker knows the payee to be fictitious and actually intends to make the paper payable to a fictitious person."

The distinction thus presented between the two cases, we think, is clear. In the case cited the principals did not put paper in cir- culation, with knowledge that the name of the payee did not repre- sent a real person; whereas, in the case at bar, the bank, through its authorized officer, put in circulation paper, with knowledge on the part of the drawer and with intent to indorse thereon the names of payees who, for all intents and purposes, were fictitious payees adopted and resorted to as a device to avert suspicion.

A case which has been frequently referred to, and which we think more like this in principle, is that of *Horstman* v. *Henshaw* (11 How. [U. S.], 183), which was a case where a bill of exchange had

upon it the forged indorsement of the payees, but it had been put into circulation by the drawers, with such forged indorsement already upon it, and it was purchased in the market by a *bona fide* holder, who presented it to the drawee, who accepted and paid it at maturity, and then the drawers failed. In that case it was held that the drawee could not recover back the money which he had paid to the *bona fide* holder; and the reason, among others, stated by the court in the opinion was, that " the bill was put in circulation by the drawers with the names of the payees indorsed upon it. And by doing so they must be understood as affirming that the indorsement is in the handwriting of the payees, or written by their authority. And if the drawee had dishonored the bill, the indorser would undoubtedly have been entitled to recover from the drawer. The drawers must be equally liable to the acceptor who paid the bill. For having admitted the handwriting of the payees, and precluded themselves from disputing it, the bill was paid by the acceptor to the persons authorized to receive the money according to the drawer's own order." And it was further said that the " English cases most analogous to this are those in which the names of the drawers or payees were fictitious and the indorsement written by the maker of the bill."

So we say that the cases most analogous to the one at bar, and the principles most nearly applicable, are those involving fictitious drawees and payees. In other words, we think that the circumstance that there was a resemblance between the names of the payees used to those of persons who were known to Bartlett, where it was not intended that such persons should become parties in any way to the paper, does not vary the rule or principle which would be applicable, if, instead of using such names, he had used those which were purely fictitious.

We are of opinion, therefore, that the judgment appealed from should be affirmed, with costs and disbursements.

Van Brunt, P. J., and Follett, J., concurred.

Judgment affirmed, with costs and disbursements.