Todd *v.* Meding.

JOSEPH  C.  TODD

*v.*

CHARLES  A.  MEDING,  MADELINE  (MINNIE)  A.  ROE,
AUGUSTUS  C.  ROE  et al.

[Filed  August 27th, 1897.]

1.  A claim against insolvent, founded on notes of $10,000 of insolvent to R.,
and sworn to by R., which alleges that deponent has assigned an interest of
$5,000 in the claim to T., and that the claim is presented on behalf of T. as
well as on deponent's behalf, sufficiently presents the claim of T. for the $5,000,
and charges the receiver with notice of the right of T., rather than R., to
receive dividends thereon.  .

2.  One to whom a claim is assigned as collateral security is, on the claim
being paid, entitled to receive the money, the debt for which the collateral
was given not having been paid, even if it was not due.

3.  Though only part of a claim is assigned, the debtor, having notice of the
assignment, cannot ignore it and pay the whole debt to the original creditor.

4.  Where a claim of $5,000 was presented to a receiver by T., and a claim
of $10,000 by R., with a recital in the latter that half of it had been assigned
to T., and that it was presented on behalf of T. as well as of R., the receiver
is not excused from liability for payment to R. of the entire dividend on the
$10,000 because of the fact that when T. received a check from the receiver
for $1,000, marked "20% dividend," the amount of dividend on his individ-
ual claim of $5,000, he made no inquiry as to whether a dividend had been
declared and paid on the $10,000 claim, or because of the fact that his attorney
saw the dividend check of R., he not having observed that it included the
dividend on the whole claim of $10,000.

5.  One for whom money is left in trust, and who, on joining with his next
of kin in a release of the trustee, obtains the money to loan to his sister, to be
loaned by her to a corporation for his benefit, has, on the corporation becom-
ing insolvent, no right to a preference because the money loaned by him had
been a trust fund.

Heard on bill, answer, cross-bill and proofs.

The complainant, Joseph C. Todd, is a creditor of the Butler
Silk Manufacturing Company, an insolvent corporation, of
which the defendant Meding is the receiver.  The defendant

Madeline A. Roe is also a creditor of the said corporation. A part of the assets has been divided and distributed by the receiver. A part remains to be divided and distributed. The allegation of the bill is that, in the distribution already made,. the defendant Meding, for some reason, paid to Madeline Roe moneys which should have been paid to the complainant, and the object of the bill is to compel Meding to make good to complainant the mispayment to Miss Roe, who is insolvent, either out of the receiver's own pocket or out of the future dividend coming to Miss Roe.

One Haffey, who was a trustee under a will for Augustus C. Roe, a brother of Madeline, is made a defendant because he claims to be interested as assignee of Miss Roe of a share of her claim against the insolvent corporation. . He has not answered. Augustus C. Roe was not made defendant by the complainant's bill, but was admitted on his own application after the cause was at issue, and filed an answer and cross-bill after the cause had been referred to a vice-chancellor and during the hearing. The complainant has answered and traversed the new matter set up by this cross-bill.

The facts and circumstances of the case are as follows : The insolvent corporation, in May, 1893, was indebted to Miss Roe in the sum of about $10,000 (witnessed, in part, by four promissory notes, one for $2,503.34, another for $4,100, another for $1,300, and another for $566.57), for money loaned and advanced by her to the company, and on that day it executed to her a chattel mortgage to secure that indebtedness, which, however, was withheld from the record until the 31st of July, 1893,. when it was duly recorded.

On the 1st of August, 1893, a bill was filed by J. H. Blauvelt for the appointment of a receiver of the insolvent company, and Meding was appointed such receiver on the 7th of August. At that time the complainant, Todd, held the promissory note of the insolvent company, dated June 8th, 1893, at six months, for $5,000, endorsed by Miss Roe, and, in order to secure him, Miss Roe, on the same 7th day of August, executed to him an assignment of a one-half interest in the chattel mortgage " and the

Todd *v.* Meding.

one-half interest of the money due and to grow due thereon, with the interest." At the same time, upon the delivery of that assignment, she entered into a written agreement with Mr. Todd by which it was agreed that in case the note for $5,000 held by Mr. Todd " is paid and discharged at maturity," then Todd agreed to reassign the one-half interest in the mortgage to her.

This assignment from Miss Roe to Todd was duly recorded on the same 7th day of August, 1893, in the record of assignments of Passaic county, where all the parties lived.

On the 31st of August, 1893, Meding, as receiver, filed his bill in this court against Miss Roe and Todd, the complainant herein, setting out the chattel mortgage and the assignment of one-half to Todd, and praying that it might be set aside and declared not a lien, with the result that the mortgage was set aside and decreed to be void. The history of that litigation is found in the report thereof in *8 Dick. Ch. Rep. 350.* The decree in this court was signed on the 16th of May, 1894, and it was affirmed, on appeal, on the 18th of November, 1895.

In that suit Todd and Miss Roe set up their defence in a joint answer, and it was conducted by Mr. (now governor) Griggs. He does not appear to have been the confidential counsel of either of the parties. Certainly he was not the counsel of either one as against the other, but was employed by them jointly to defend that suit upon the understanding that the expense was to be equally divided between them.

Pending the hearing before the vice-chancellor of the suit of *Meding* v. *Roe,* a petition was presented by the receiver in the Blauvelt insolvency suit for leave to sell the mortgaged property, free and clear of the encumbrance of the chattel mortgage, and such order was made on the 28th of December, 1893. Such sale was made in March, 1894, with the result that the chattels mortgaged realized about $6,500. In addition to that sum, the receiver had in his hands nearly $19,000, proceeds of the sale of other property, and the total amount of claims was a little over $56,000. Upon the presentation to the court of these facts he was ordered to make a dividend of twenty per cent. among the creditors, payment of which would leave in his hands suffi-

cient to meet the demand of the chattel mortgage, if it should be sustained.

In the meantime, on the 18th of September, 1893, in the usual course of business, the receiver obtained an order calling on the creditors to present their claims within three months from that date. Neither Miss Roe nor Mr. Todd presented any claim within the time, and on the 8th of January, 1894, before the case of *Meding* v. *Roe* was argued, Governor Griggs, as solicitor of Mr. Todd and Miss Roe, gave notice of a motion to extend the time within which Miss Roe and Mr. Todd might present their claims, and an order was made accordingly, extending the time to the 20th of January, instant. Governor Griggs already had in his hands the sworn claims, ready for presentation. That of Mr. Todd was sworn to before his present solicitor, Mr. Osborne, as master in chancery, on the 6th of January, 1894; that of Miss Todd was sworn to on the same day before Governor Griggs; but both appear to have been prepared under the direction of Governor Griggs. A memorandum is made at the foot of the claim of Mr. Todd, in Governor Griggs' handwriting, of the note and protest fees. It is based upon the promissory note before mentioned of June 8th, 1893, for $5,000, at six months, endorsed by Miss Roe. The claim of Miss Roe is based upon the four promissary notes above mentioned. Both claims are in typewriting, with the exception of a special clause in Miss Roe's claim, which is in the handwriting of Governor Griggs and in these words:

"Deponent further says that an interest to the extent of $5,000 in said claim has been assigned by her to J. C. Todd as collateral security, and this claim is presented on behalf of the said Todd as well as on her own behalf."

These claims were handed by Governor Griggs to Mr. Stevenson, counsel for the receiver, and by him to the receiver, and with the others against the insolvent corporation were entrusted by Mr. Meding to a bookkeeper and accountant—Mr. Townley—who duly arranged and tabulated them, and in so doing entered on the list of creditors the claim of Miss Roe as being in favor of her alone, instead of in favor of her and Todd in the proportion of each one-half, as he might have done

Todd v. Meding.

according to the terms of the special clause inserted therein above quoted. This appears by the answer of the defendant herein, and by the list of proven claims annexed to the report of the receiver presented to the court in the insolvency suit as a basis for an order of partial distribution. The same book-keeper prepared the checks to be paid to the creditors and to be signed by Mr. Meding as receiver, and the corresponding receipts to be signed by the creditors. They are dated June 4th, 1894. That of Mr. Todd was for $1,000.37, and that of Miss Roe was for $2,071. (This was after decree had passed in this court against Todd and Roe in *Meding* v. *Roe,* but before its affirmance on appeal.)

It will be perceived, by the amount of these checks, that Todd received twenty per cent. on his claim of $5,000, and Miss Roe twenty per cent. on her claim of $10,000. It would be fairly inferable from the circumstances that Mr. Townley, in drawing the checks, followed thoughtlessly the list of creditors above referred to, but upon his attention being particularly called to it on the stand, he swears that he had Miss Roe's sworn claim before him when he drew her check, and that he observed that one-half of it belonged to Mr. Todd as collateral security. Asked whether he inquired as to whether one-half of the claim ought not to be paid to Mr. Todd, says he did not. Asked whether it did not strike him at the time that the claim was one-half of it for Miss Roe and one-half of it for Todd, answered :

"No, sir; Todd has his proof of claim.

"Q. Well, he had a claim, but you knew nothing about that; this claim was declared to be, as to one-half, in favor of Miss Roe, and, as to the other one-half, in favor of J. C. Todd, and this language is used : 'This claim is presented on behalf of the said Todd as well as on her own behalf?'

"A. But it says there as 'collateral security.'

"Q. What of that? The claim is presented on behalf of each; that didn't strike you at the time?

"A. No, not at all."

These checks were drawn on the Second National Bank of Paterson, and had stamped on their face "twenty per cent. dividend." Mr. Todd seems to have deposited his check in the

First National Bank of Paterson, and it was paid by the Second National Bank on the 7th of June, 1894. Miss Roe drew the money for hers in person on the 9th of June, 1894. She paid one-half of the proceeds to her brother's trustee, Mr. Haffey, and the other one-half she spent for her own purposes and is wholly insolvent.

Before drawing the money she called upon Governor Griggs, and, as she swears, asked him whether that money was hers for her to do as she chose with, and that he answered that it was.

Governor Griggs recollects the circumstance of her calling, but not precisely what occurred. He says that the call was a casual one, made while his attention was occupied with some other matter of business, did not excite his serious attention, and he cannot recollect distinctly what passed, but he feels quite sure · that he did not say anything to Miss Roe to indicate that she had a right to hold all of that money as against Mr. Todd.

The facts upon which Augustus C. Roe's right in the fund is based are substantially as follows: An aunt of Augustus and his sister died in New York, leaving some money in trust for the benefit of Augustus, and Haffey was the substituted trustee in charge of that fund. Augustus Roe was out of business and seeking employment, and sought it of the Butler Silk Manufacturing Company. His sister, Madeline, had already advanced to that corporation funds of her own, and in order to procure him a situation at a remunerative salary she agreed to increase the loan to $10,000, and for that purpose obtained of Haffey upwards of $3,000 of the trust fund to loan to the silk manufacturing company, and that money made a part of the $10,000 owed by it.

The language of the trust in the will is as follows:

"To be held in trust, to pay over the interest and income thereof to my nephew, Augustus C. Roe, from time to time, for and towards his maintenance and support, and whenever, in the exercise of their discretion, she [that is, the trustee] shall be satisfied that my said nephew is in unembarrassed circumstances, and that payment thereof to him will inure to his benefit and advantage, then I authorize and empower her [the trustee] to pay over to him the amount of the trust fund in her hands, and his receipt thereof shall be a sufficient discharge from the trust thus created."

Upon the payment of that money, Augustus C. Roe, his mother, Eliza Roe, and his sister, Madeline, executed a release to Haffey, the trustee, in these words:

"Whereas, on the 11th day of January, 1893, John Haffey was duly appointed by an order of the New York superior court, city and county of New York, the substituted trustee of Augustus C. Roe under the last will and testament of Caroline A. Roe, deceased; and whereas, as such trustee he has received from the executors of the last will and testament of the said Caroline Roe, deceased, the sum of twenty-seven hundred and ninety-three 34/100 dollars; and whereas, it is the desire of Augustus C. Roe, the beneficiary of such trustee, to loan said sum of money to his sister, Minnie A. Roe, one of the parties hereto, to be by her invested in the Butler Silk Manufacturing Company, in which company the said Augustus C. Roe is interested, the said Augustus C. Roe hereby stating that the said company is responsible and is solvent and the said Minnie A. Roe having security for the said loan:

"Now, therefore, this agreement, made by Augustus C. Roe, the said beneficiary, Minnie A. Roe, his sister, and Eliza Roe, his mother, with the said John Haffey, trustee, witnesseth as follows:

"*First.* The said Augustus C. Roe hereby requests and directs the said John Haffey, after payment of the expenses incurred for attorneys' fees, &c., in the proceedings praying for the appointment of a trustee, &c., in the matter above mentioned, to loan the balance of the said trust fund to the said Minnie A. Roe, who is to invest said moneys with the Butler Silk Manufacturing Company, on interest; and upon such investment being made, the said parties hereto forever release and discharge the said John Haffey from any claim, demand, action or proceeding that may arise or grow out of or by reason of the loss of the said moneys or any part thereof; said parties further agree that they will take no steps to make any claim against said John Haffey, trustee, at any time, it being their desire that said moneys shall remain so invested as above mentioned, they having full control thereof; and it is further understood and agreed that this agreement shall be a bar, estoppel and defence to any proceedings in actions brought by the said Roes or either of them, arising out of the matters herein mentioned, unless the said moneys should be returned to the said John Haffey, trustee; but in no event shall the sureties of the said John Haffey, trustee, given by him on the 3d day of February, 1893, be liable for any cause or reason whatever, we, the said Roes, if any liability occurs, looking only to said trustee.

"It is further understood, that this agreement shall bind our heirs, executors, administrators and assigns.

"In witness hereof, we have hereunto set our hands and seals this 9th day of February, 1893."

The exact amount of the Augustus C. Roe fund included in the $10,000 mortgage was $3,070.01, and is witnessed by two of the notes secured by the mortgage, in these words:

Todd *v.* Meding.

"$2,503.34/100. PATERSON, NEW JERSEY, February 9th, 1893.

"One year after date we promise to pay to the order of John Haffey, trustee for Augustus C. Roe, at the First National Bank of Paterson, two thousand five hundred and three dollars and 34/100. Value Received.

"THE BUTLER SILK MANUFACTURING Co.
"R. V. BUTLER, *President.*"

"$566.67. PATERSON, NEW JERSEY, April 22d, 1893.

"One year after date we promise to pay to the order of John Haffey, substituted trustee for Augustus C. Roe, at the First National Bank of Paterson, ———— dollars. Value Received.

"BUTLER SILK MANUFACTURING Co.
"R. V. BUTLER, *President.*"

In January, 1894, about the time of verifying her claim against the insolvent company, Miss Roe made and executed an assignment of the remaining one-half of her claim to John Haffey, her brother's trustee.

The claim set up by Augustus C. Roe's cross-bill is that he is entitled to be paid the $3,070.01 trust funds out of the dividends on the whole $10,000, in preference to the complainant herein.

*Mr. Joseph P. Osborne,* for complainant.

*Mr. Eugene Stevenson,* for Meding.

*Mr. John S. Barkalow,* for Augustus C. Roe.

PITNEY, V. C.

The first question raised at the argument was to whom was the dividend upon the claim of $10,000, verified by Miss Roe, properly due and payable. It was argued that it was due and payable to Miss Roe because the debt was originally due to her; that the affidavit was made by her, and the receiver was not bound to notice or act upon any partial assignment of the debt, or, at least, that the notice of the assignment contained in the sworn claim amounted to no more than a mere declaration of trust by Miss Roe which reserved to her the right to receive the dividend as trustee for Mr. Todd and pay it over to him.

Todd v. Meding.

The point is thus put in the remarkably able brief of defendant's counsel: " *First.* Treating this as a case of notice from the assignee of a debt to the debtor, Meding is not charged under the circumstances with notice of Todd's right to receive the money instead of Miss Roe."

I am unable to adopt that view. The claim was, on its face, plainly made in favor of Todd to the extent of $5,000—just one-half—and in favor of Miss Roe for the remainder. The language used—"this claim is presented on behalf of the said Todd as well as on her own behalf"—will admit of no other interpretation. The express declaration "that an interest in the said claim has been assigned by her to J. C. Todd as collateral," is in and of itself an assignment of so much of the debt, quite independent of the previous formal deed of assignment duly made and executed by her, of which Meding and his counsel had full notice.

An ingenious argument was made to the effect than an assignment as collateral did not vest in the assignee any right to the immediate receipt of the money, and that Todd's right to receive the money from the receiver depended upon the question whether or not the state of the indebtedness, as collateral to which the assignment was made, was such as to entitle him to receive the money as between him and Miss Roe.

But I do not understand such to be the law. Take a simple illustration. If A wishes to borrow money from B, and holds a bond and mortgage of C, which is due, but upon which he cannot immediately realize, and gives his promissory note to B for a sum of money payable at a future day, and assigns the mortgage of C to B as collateral to that note, and before the maturity of the note, C wishes to pay his mortgage, and has notice of the assignment to B as collateral, he cannot, with safety, pay the money to A, the mortgagee. B is entitled to receive the money, although the debt which it is assigned to secure is not yet due. The assignment vests the title to the money in the assignee. The mere fact that it is assigned as collateral, does not alter the situation of the parties. Any other rule would destroy the value of such an assignment. The fact

Todd *v.* Meding.

that the assignment is merely as collateral to a certain debt, does not affect the intrinsic character of the transaction or disentitle the assignee to demand the money, so long as the debt which it is assigned to secure still exists.

The circumstance that only a part of the claim was assigned, does not affect the result. It is too late to dispute the proposition that a part of a debt may be effectually assigned in equity. The qualifying rule that such an assignment cannot be enforced by action at law without the acceptance or assent of the debtor does not vary the result. The qualifying rule avails the debtor only to the extent that if he wishes to dispute the existence of the debt, he is entitled to make his defence in a single suit, and cannot be subjected to several suits at law. But it does not justify him in ignoring the partial assignment, after he has notice of it, and in paying the whole sum to the original creditor. To so hold would be to nullify the doctrine which sanctions partial assignments. The rule is well settled that the payment of the whole debt to the original creditor, after notice of an assignment of part of it, will not avail the debtor when sued in equity by the assignee. If the debtor is in any doubt as to the right of the person claiming to be an assignee, as against the assignor, he has an easy remedy. He can inquire of the original creditor and alleged assignor, and if he denies the assignment the debtor may file his bill of interpleader.

I can find no solid basis for the notion that Miss Roe occupied the position of trustee of a part of this fund for Mr. Todd, with power, as such, to receive the money without his consent. In one sense no doubt she was a trustee, but not in the sense which would give her a legal right to handle the money for his use and benefit and without his consent.

By the old common-law practice the assignee of a negotiable chose in action was obliged to bring suit thereon in the name of the original contractee as nominal plaintiff to his use. But the necessity to use the name of the original contractee as nominal plaintiff did not authorize the payment by the debtor of the amount due to such plaintiff in person, after notice of the assignment.

---

Todd v. Meding.

---

The next question is, was the receiver excusable for the mistake he made of paying the whole dividend to Miss Roe ?

The particular defence developed in the brief of counsel, which applies to this part of the case, is this :

"*Second.* This is not an ordinary case between a debtor and the assignee of the debt. The receiver was an officer of the court of chancery administering a fund in an official capacity and bound to distribute that fund according to the orders of the court among a certain definite class of creditors who should pursue certain specified legal proceedings to lay their claims before the receiver. Todd never complied with the law and the orders of the court of chancery in respect of any interest he had in the $10,000 claim. He did make himself a party to the insolvency proceedings before the receiver in respect of his $5,000 claim. It follows that the receiver never had any right to pay one dollar of the dividend on the $10,000 claim to anybody but Miss Roe, who presented and proved it."

This proposition, like the other, seems to me entirely untenable. The claim, in my judgment, was properly and artistically made out and verified. I am unable to see in what respect it could have been improved. It was plainly presented on behalf of both Todd and Roe. On its face Todd was the payee of one-half of the amount. The verification of all such claims should always be make by the party who has personal knowledge of it— such a person as would be competent to prove the facts to sustain the claim if called as a witness in a court of justice. Now Mr. Todd, personally, knew nothing about the foundation or merits of that claim. He could not properly swear that Miss Roe ever loaned $10,000 to the Butler Silk Manufacturing Company. Miss Roe was the proper person to make the affidavit, precisely as her agent would have been if she had not made the loan herself in person, but had entrusted it to an agent. So the claim was properly framed and verified, and it was properly stated to be a debt originally due to Miss Roe, and assigned, as to one-half, to Todd ; and to my mind there was not the least perplexity or difficulty in dealing with it as such.

The argument of counsel goes so far as to hold that as the

claim was sworn to by Miss Roe as a debt originally due to her, and the court made a decree that the receiver pay a dividend of twenty per cent. to the several creditors who had proven their claims, the result was tantamount to a specific decree that he should pay to Miss Roe, and to nobody else, a dividend on the sum of $10,000 mentioned in her claim, simply because she had verified it. But I do not understand such to be the effect of the proceedings. The order is to make the dividend among such persons—not naming them—as shall be found to be creditors. The language of the order—"to distribute to the creditors who have duly proved their claims to his satisfaction"—does not mean to distribute to such persons only as have personally verified their claims, but to such as have caused or procured proof to be made, &c. Todd comes within that description. Through his counsel he had caused proof to be made by Miss Roe.

The duty of the receiver is to receive the claims, and see that they are properly verified and substantiated. In that he acts as a judge. If he sees anything suspicious about them he may, and should, except to them. In all this he is expected to act with a fair degree of intelligence and sound judgment, and if he is at a loss at any time, to resort to his counsel or to the court.

In this case, Governor Griggs, who prepared this claim, had a right to rely upon the fact that Mr. Meding's counsel, Mr. Stevenson, was perfectly familiar, as shown by the pleadings in the suit of *Meding* v. *Todd and Roe*, with all the facts and circumstances attending these two claims—the one of $5,000, on the part of Todd, and the other of $10,000, on the part of Miss Roe. The whole debt was $15,000. Todd had not only the standing of an individual unsecured creditor on his $5,000 note, but he also held, as was well known by Mr. Stevenson, an assignment to the extent of one-half of Miss Roe's claim of $10,000—claimed to be secured by mortgage—as security for his $5,000 unsecured debt; and the several rights of the parties were perfectly clear, simple and well defined.

The two sworn claims of Mr. Todd and Miss Roe were handed in person by Governor Griggs to Mr. Stevenson and by

Todd v. Meding.

him handed to Mr. Meding.    Then if either Mr. Meding or his
counsel were in doubt as to the duty of the receiver, it was open
to them to apply to the court for directions in the premises, upon
notice to both Todd and Miss Roe.    It is quite impossible to
believe that Mr. Stevenson would have advised or permitted the
payment to Miss Roe had he been consulted about it.

It is here to be remarked that a receiver is not a mere un-
thinking machine, performing a routine duty in a perfunctory
manner, but is expected to be an alert and cautious man of busi-
ness, possessed of ordinary intelligence and common sense, which
he is to exercise and apply in the details of the affairs entrusted
to him.    The familiar rule is that he is to exercise the same care
and caution that an ordinarily prudent and cautious person would
exercise in his own affairs.

Now it was clearly the duty of the receiver in this case to
scrutinize each one of these claims submitted to him, and to
ascertain their validity and freedom from suspicion, and to ascer-
tain to whom they were severally payable.    In all this work he
was, as before remarked, entitled to counsel and, if necessary, to
the aid of the court.    The evidence shows that being himself a
busy man of affairs, he left this work to an expert accountant,
who erroneously supposed that the fact that the assignment to
Todd was merely as collateral, left the payment properly to be
made to Miss Roe.    This was, in my judgment, an inexcusable
blunder, for which the receiver must be held liable.    A low
degree of prudence and caution would, as it seems to me, have
induced him to pause when he opened and read the Roe claim
and to consult his principal, the receiver, or his counsel, before
drawing a check to and a receipt from Miss Roe for the whole
dividend.

The next point for the defence set up in argument is this :

" If Meding made a legal error in paying money to Miss Roe
which he was legally bound to pay to Todd, Todd, by his con-
duct of omission and commission, has barred himself from any
recovery against Meding by an equitable estoppel."

It was argued that when Todd received his check for $1,000,
which had plainly stamped upon its face " twenty per cent.

Todd *v.* Meding.

dividend," he ought at once to have observed that it covered
only a dividend on his $5,000 note, and that a corresponding
dividend was due upon the Roe claim, of which one-half should
have been paid to him; that he should have at once reasoned
and concluded that a mistake had been made and should at once
have inquired of the receiver, who would thus have been noti-
fied of his mistake and in turn might have stopped payment of
the check to Miss Roe; or, if too late for that, he had the chance
of recovering the overpayment from her while it was still in her
hands, unexpended.

In support of this position he relies upon the rule of implied
notice, and charges Todd, contrary to the fact, with knowledge
that the Roe claim had been duly presented to and allowed by
the receiver, because it had been prepared and presented by
Governor Griggs, who was acting as solicitor and of counsel for
both Todd and Roe.

But I do not think the doctrine of implied notice can be in-
voked for the purpose of charging Mr. Todd with actual negli-
gence in not acting on such knowledge. As we have seen,
Meding, the receiver, made the first blunder, and was guilty of
negligence in paying money belonging to Todd to a person not
entitled to it, and seeks to be relieved of his negligence by
charging the person injured thereby with negligence in not noti-
fying him.

Now, for the purpose of charging negligence in such a case,
actual, as distinguished from implied, notice is, in my judgment,
necessary. Such notice is lacking in this case. Mr. Todd left
the management of the whole affair to Governor Griggs. And
while, of course, he knew of the presentation of his own claim—
for he not only swore to it in person, but received a dividend
upon it—there is nothing in the case to indicate that he actually
knew that a claim had been presented for the money secured by
the Roe mortgage; and if he had known and kept in mind such
presentation, it does not follow that he was bound to infer and
take affirmative notice that a dividend had been declared and
would be paid on it. The contention was that the claim was
secured by a first lien on the plant of the insolvent corporation;

Todd *v.* Meding.

and though at the time the dividend was paid that claim of lien had been disallowed by this court, yet an appeal from that decree had been made, and the result was, of course, uncertain. And it must be observed that if the lien was finally established the claimants, Todd and Roe, would not be entitled to a dividend on the whole debt of $10,000, but only upon the balance remaining due after applying the proceeds of the sale of the plant. Altogether the situation was such as that Mr. Todd, even if he had known that the Roe claim had been presented and allowed, might well have failed to infer that a dividend upon it had been actually paid to Miss Roe instead of to her or himself jointly or in halves. He swears, in substance, that he did not suppose or expect that any dividend would be declared on it at that time.

And it is further to be observed that he cannot be charged with negligence in not being alert and quick to suspect that Mr. Meding had made a blunder of the kind we have seen, resulting to his (Todd's) prejudice. He was entitled to rely upon Mr. Meding, aided as he was by competent counsel, taking care to do this duty properly and legally.

But reliance in this part of the defence is principally had upon what occurred between Miss Roe and Governor Griggs. Taking into consideration the evidence of both persons, the fair inference is that Miss Roe did show Governor Griggs her check for $2,000, and did, in substance, ask whether the money was hers, but that Governor Griggs did not give the matter sufficient serious attention to lead him to perceive that a mistake had been made. He did not observe that a dividend on the whole $10,000 was covered by the check shown him. Undoubtedly if he had given the affair closer attention, he would have perceived that it required a dividend on the whole claim of $10,000 to make the amount of the check. But he did not so observe, and the question is whether the failure to detect the error amounted, under the circumstances, to such negligence as will avail the defendant as a defence to this action.

Here, again, I can find no foundation for the position that Governor Griggs was under the least obligation to Mr. Meding

to be on the alert to suspect and discover mistakes on his (Meding's) part affecting the governor's clients. He undoubtedly knew and had in mind just how the Roe claim was framed and that it passed through the hands of Meding's counsel, and he no doubt relied upon Mr. Meding's well-known character as a business man and the undoubted competency of his counsel. And I doubt if he would readily have believed the evidence of his own senses if he had observed that the whole dividend upon it had actually been included in a single check to Miss Roe's order and delivered to her. It may be unfortunate for Mr. Meding that Governor Griggs did not discover the mistake and stop it right there, as he no doubt would have done, but the fact is that he did not discover it, and I think his failure so to do cannot help Mr. Meding.

Counsel for defendant relies on this part of the case on a line of decided cases in which admissions have been made contrary to the truth, but no positive action has been taken upon the strength of them, and yet the party making them has been held bound because they had the effect of preventing the other party from taking certain remedial measures within his reach. But in each of those cases there was a positive admission brought to the other party's notice, who rested upon it. Here there was no such admission of the correctness of the payment in question, nor was it brought to the notice of Mr. Meding, nor did he at all rest upon it.

The leader of this line of cases is *Knights* v. *Wiffen, L. R. 5 Q. B. 660.* In that case the plaintiff had purchased and paid for a quantity of barley in store with the defendant, a warehouseman, from a party—Maris—who had a contract to purchase the same from the defendant, but was not entitled to the delivery because he had not paid for it. Upon presentation, after such payment, by plaintiff to defendant of a delivery order for the barley, defendant admitted that the amount was in store with him to the credit of Maris, but afterwards refused to deliver because Maris had not paid him and had failed. It was held that he was estopped from setting up that defence because, by reason of his previous admission, plaintiff had lost the

Todd v. Meding.

opportunity to recoup himself from Maris, the insolvent dealer. Mr. Justice Blackburn (at *p. 665*) says: "In the present case the money had been paid before the presentation of the delivery order, but I think, nevertheless, that the position of the plaintiff was altered through the defendant's conduct. The defendant knew that, when he assented to the delivery order, the plaintiff, as a reasonable man, would rest satisfied. If the plaintiff had been met by a refusal on the part of the defendant he could have gone to Maris and have demanded back his money. Very likely he might not have derived much benefit if he had done so, but he had a right to do it. The plaintiff did rest satisfied in the belief, as a reasonable man, that the property had been passsd to him."

This case was followed in the New York courts in *Voorhees* v. *Olmstead, 3 Hun 744, 6 N. Y. 113,* a case on all-fours with *Knights* v. *Wiffen.*

In the same line are *Casco Bank* v. *Keene, 53 Me. 103; Fall River National Bank* v. *Buffinton, 97 Mass. 498; Union Bank* v. *Middlebrook, 33 Conn. 95,* and *Continental Bank* v. *National Bank of Commonwealth, 50 N. Y. 575.*

In these cases (which were followed by our supreme court in the unreported case of *Manasquan Bank* v. *Hendrickson,* about 1886), the bank had discounted notes purporting to be endorsed by the defendant, and after such discount had shown the endorsement to the defendant, who had, contrary to the fact, admitted his signature to be genuine, thereby lulling the bank into fancied security and preventing prosecution or any effort to recover the money from the forger until too late, and it was held that the defendant was estopped to deny his signature.

In each of the cases just cited, except *Continental Bank* v. *Bank of Commonwealth,* the admission was untrue to the knowledge of the party making it.

In the latter case the circumstances were these: Cronise & Company, dealers in gold—then at a premium—contracted to sell $50,000 in gold to one Ross, who, in payment, presented a currency check on the Continental Bank (where he kept a currency account) purporting to be certified by the teller of that

bank. Cronise & Company kept their gold account in the Bank of New York and drew a check on that bank, to the order of Ross, for the gold, but before delivering the check to Ross sent their clerk to the Continental Bank with Ross' check, who asked the teller if it was all right. The teller, not observing or suspecting a forgery, answered that it was; but before the clerk returned with Ross' check to Cronise & Company they had delivered the gold check to Ross and he had left their office. He promptly drew the gold and got out of the country with it. Cronise & Company deposited Ross' check in their currency account with the Commonwealth Bank and it was returned to that bank by the Continental Bank, through the clearing-house, as not good and the teller's certificate as forged. It was held that the loss must fall on the Continental Bank.

It is to be observed that it was the duty of the teller of the Continental Bank, when Ross' check was presented to him, to scrutinize it and satisfy himself both as to whether Ross' account was good for it and as to the genuineness of the certificate, and the existence of that duty on the part of the teller in that case distinguishes it from the case now under consideration.

There is another line of cases between banks and their depositors arising out of payment by the bank upon two classes of forged paper—one, where the depositor's name has been forged and the bank has paid the check; and another where the name of the payee in the check has been forged and the bank has paid upon such forged endorsement. The cases are numerous and present some apparent contrariety of decision. The general ground on which the banks have attempted to sustain such payments is that the depositor's bank-book has been written up and the forged vouchers returned to him, and he has kept them such a length of time without discovering and notifying the bank of the forgery as to charge him with the loss.

The disposition of the courts seems to be to hold that where the name of the payee of the check has been forged, no duty of scrutiny, when the forged voucher is returned, falls upon the depositor; but where the name of the depositor has been forged to a check, the duty is cast upon him of discovering it and immediately notifying the bank.

Todd *v.* Meding.

The subject is discussed in *2 Dan. Neg. Inst.* §§ *1370, 1654 et seq.*, and in *Rand. Com. Pap.* § *1468 et seq.* From among the numerous cases, I cite *Belknap* v. *National Bank, 100 Mass. 376; National Bank of Commerce* v. *National Mechanics' Banking Association, 55 N. Y. 211; Frank* v. *Chemical Bank, 84 N. Y. 209; Leather Manufacturers' Bank* v. *Morgan, 117 U. S. 96; Dana* v. *National Bank of the Republic, 132 Mass. 156*, and *Shipman* v. *Bank of the State of New York, 126 N. Y. 318.* In several of these cases the forgeries consisted in an alteration of the checks, and in others, forgeries of the signatures of the payees, and were perpetrated by the confidential clerks of the depositors; and yet the banks were held liable, and not the depositors.

Mr. Justice Harlan, speaking for the supreme court of the United States, in *Leather Manufacturers' Bank* v. *Morgan, supra* (at *p. 117*), quotes, with approval, from the court of appeals of New York, in *Frank* v. *Chemical Bank, supra*, the following language, which has some application here: "Banks are bound to know the signatures of their customers, and they pay the checks purporting to be drawn by them at their peril. *If the bank pays forged checks it commits the first fault. It cannot visit the consequences upon the innocent depositor who, after the fact, is also deceived by the simulated paper.* So, if the depositor in the ordinary course of business commits the examination of the bank account and vouchers to clerks or agents, and they fail to discover checks which were forged, the duty of the depositor to the bank is discharged, although probably if he had made the examination personally he would have detected them. The alleged duty, at most, requires the depositor to use ordinary care, and if this is exercised, whether by himself or his agents, the bank cannot justly complain, although the forgeries are not discovered until it is too late to retrieve its position, or make reclamation from the forger."

The point of this extract is that it recognizes the doctrine above stated, that the party who commits the first fault or blunder has no right to anything more than ordinary care on the part of other parties to assist in correcting the mistake.

An examination of the numerous authorities cited by counsel for defendant fails to disclose any which covers the case in hand. And I am unable to find any ground upon which the receiver in this case can be relieved and credited with the overpayment to Miss Roe. And as Miss Roe assigned the other one-half of her claim to her brother's trustee before this mistake was made, the receiver cannot retain out of what would have been her share of the next dividend anything to indemnify him in the premises.

I am unable to find any solid foundation for granting relief to Augustus C. Roe on his cross-bill. He deliberately joined with his next of kin in a release to the trustee for this fund, and loaned it to the insolvent corporation, and it was advanced for his own individual interest. The mere fact that it was trust funds cannot help him under these circumstances. The fund lost its quality as a trust fund; and it does not lie in the mouth of Mr. Roe to claim preference on that ground. If Miss Roe had not assigned to his trustee the one-half of her claim, I should have been of the opinion that he would have been entitled to only a dividend on the $3,070.01.

I will advise a decree accordingly.