above cited. This act was amended by chapter 688 of the Laws of 1892, and which provides that there shall be no liability for a false report unless the creditors sustain damages relying upon the credit thereof. While the plaintiffs bring themselves within the strict language of the act of 1848, as the parties making the certificate were stockholders and officers at the time this debt of the plaintiffs was incurred, yet that retroactive scope cannot be given to the act. The object of making and filing a certificate or report is to give notice to those dealing with or giving credit to the corporation. If such persons are deceived, or may be deceived, by the false report, a liability attaches for the offense of the officers in making and filing it. If, however, the debt was incurred before the misconduct of the officers, then no damage accrued to the creditor by reason of the vicious conduct in making the false report. No reliance, therefore, could have been placed upon it, and no liability would inure to such a creditor. But the complaint further says:

"That by force of the statute under which said Fonda Lake & Port Leyden Paper Company was incorporated all of the said trustees signing such false certificate became jointly and severally liable for all the debts of the said company contracted while they were stockholders or officers thereof, and the indebtedness for which plaintiffs' judgments were received was incurred while said defendants were trustees and stockholders."

Under this general allegation proof is permissible that the indebtedness of the plaintiffs, or some of them, was incurred subsequent to the making of this alleged false certificate. That being so, the cause of action is not demurrable, and, if plaintiffs can give proof that the debt accrued subsequent to the filing of the report, then they bring themselves within the provisions of the statute. If, however, the debt was incurred prior to that time, the defendant can fully protect himself by objection and exception, if necessary. It is not within the province of the court on demurrer to hamper or restrict the plaintiff in his proof, if, within the four corners of his pleading, it can be given at all. The interlocutory judgment should be affirmed, with costs and disbursements to the respondents, with leave to withdraw demurrer and answer on payment of costs.

So ordered. All concur.

---

(60 App. Div. 241.)

CRITTEN et al. v. CHEMICAL NAT. BANK.

(Supreme Court, Appellate Division, First Department. April 29, 1901.)

1. DEPOSITS—FORGED CHECKS—PAYMENT—LIABILITY OF BANK—NEGLIGENCE OF DEPOSITOR.

Plaintiff's confidential clerk prepared checks payable to certain creditors of plaintiff, each check being presented to plaintiff for signature, who compared it with the original bill, and placed it in an envelope directed to the payee, which he sealed, and placed in the mailing drawer. The clerk, in making the checks, left spaces between the dollar mark and the figure of the amount where it was punched and written, and afterwards stole the checks from the mailing drawer, raised them by perforating additional figures, and also writing them in the spaces left by him, then erased the name of the payee, and substituted "Cash," on which he obtained money from the defendant bank on which they were drawn.

*Held*, in an action to recover the amount thus added, that plaintiff was not guilty of such negligence as to discharge the bank of its liability.

**2. SAME—NEGLIGENCE OF BANK.**

The checks showed the signs of alteration, and the paper showed erasures, so that in one instance the cashier required the clerk's indorsement, and also required several of the checks to be indorsed, because of the large amount for which they were drawn, and only paid many of them because presented by plaintiffs' clerk, who it did not appear was authorized to indorse checks, or in the habit of presenting the firm's cash checks. *Held*, in an action against the bank, that it was negligent in cashing the checks.

**3. SAME—ESTOPPEL—FAILURE TO EXAMINE VOUCHERS.**

Where a bank has paid raised checks, the depositor is not estopped from maintaining an action against the bank to recover the amounts thereby obtained by failing to examine his bank account and vouchers when returned to him by the bank, by which he would have discovered that the checks had been raised, and thus prevented further acts of such kind.

**4. SAME—EMPLOYMENT OF CLERK.**

Where plaintiffs' confidential clerk had for years been employed and trusted, but had absented himself from business at different times, and was suspected of intemperance, but plaintiffs had no cause to doubt his honesty, they were justified in intrusting to him the duty of examining the checks drawn on their bank account, and are not estopped by such employment from maintaining an action against a bank for amounts paid to such clerk on checks raised by him, and which he was enabled to conceal by his examination of the checks on their return from the bank after payment.

**5. AGENT'S FRAUD—KNOWLEDGE IMPUTABLE TO PRINCIPAL.**

Where plaintiffs' confidential clerk for a long period of time raised checks drawn by his employer, and obtained the money thereon, his knowledge of such acts, obtained in the performance of his duties of examining the vouchers returned by the bank at regular intervals and comparing them with the stubs, and which would have been discovered by an innocent party, is not imputable to the employer, so as to bar an action against the bank for the amount obtained by such fraud.

Van Brunt, P. J., dissenting.

Appeal from judgment on report of referee.

Action by De Frees Critten and others against the Chemical National Bank. From a judgment in favor of plaintiffs, defendant appeals. Affirmed.

The action was brought to recover a balance of $3,800 of deposits which the plaintiffs had made, and which the defendant claims to have paid and settled. The amount named was in fact paid by the defendant upon altered checks to one Davis, formerly employed as clerk by the plaintiffs, and now serving a sentence in state's prison for forgery. By consent the issues were sent to a referee. It appears from the evidence that there were in all 24 raised and altered checks which were cashed by the bank between September, 1897, and October, 1899, during which period a great volume of business was done by the plaintiffs by means of checks drawn upon the defendant. Mr. De Frees Critten, one of the plaintiffs, testified that Davis was one of his confidential clerks, having been in his employ since 1890, and frequently wrote checks to be signed; that after Davis had prepared the checks, and handed them to him, with the bills for which they were drawn, he would sign them for the firm after comparing and examining them, and place them in a mailing drawer in sealed and addressed envelopes, with which drawer Davis had nothing to do. The checks were tinted for safety to disclose any erasures, and the amount was written regularly in black ink, and then in red ink, and over the latter, the firm's name was signed. Furthermore, the dollars were punched in the check by a machine. The method by which Davis altered and secured money on the checks after surreptitiously taking

them from the mailing drawer was thus described by him: He "would, with chemicals or acid, remove the date, * · * as well as the amount and name of the payee, and * * * would fill in the date, fill in the word 'Cash' as payee, * * * and fill in the raised amount of the check. He would place the check again in the perforating machine, and cut out the additional figure representing the amount raised between the first dollar sign and the first figure of the amount as originally cut, thus filling in the space left blank for that purpose when the check was drawn and signed. He would add the additional figure representing the raised amount in red ink in the right-hand lower line over the signature in a space left by him for that purpose. He would then take the check to the Chemical Bank, present it to the paying teller, to whom he was known as employed by Critten, Clift & Co., and obtain the money on the check, being the amount to which it had been raised." After receiving the money, he would personally call on the one whose bill it was intended should be paid, and pay the amount of the bill, which would be receipted, and returned to him, and filed with the firm's papers. Most of the checks he altered by adding the figure "1," and thus the first check was raised from $13.94 to $113.94. One he raised from .99c. to $600.99. This check, which was dated September 27, 1898, and a previous check for $112.49, dated June 20, 1898, and the last two checks, dated October 12 and October 19, 1899, for $575.87 and $622, respectively, he was required by the bank teller to indorse; the large ones because of the unusual amount, and the small one because it looked badly. Part of his duties was to compare returned checks with the stub book when the bank book was balanced every two months, and, to avoid detection, he made the footings of the stub book compare with the bank account, either by making them larger than what the stubs would show, or else, in some instances, by changing the amount of the stubs. Some of the returned checks, it appears, he again erased and altered to correspond with their original appearance. Furthermore, he took most of the checks to his home. His thefts were discovered for the reason that in his absence from the office for two days another clerk made comparisons with the check book, and discovered the discrepancies. Notice was then at once given to the bank, and, upon being arrested, Davis confessed his guilt. The paying teller of the bank testified that in general the alterations were not such as would apprise him of forgery, although in some instances the punched figures were apparently uneven and crowded; but he admitted that some of the checks bore erasures, and that he would not have honored them if presented by a stranger, but, as he knew Davis, and in one instance required him to indorse a defaced check, he made the payments to him. An expert pointed out many evidences of alteration, some visible to the eye,—such as that the red ink of some of the figures was above, while of others it was below, the firm's signature; and others not so apparent,—such as that all the writing was not done at the same time, and that there was "feathering" of the ink where there had been erasures. As to Davis' character, Mr. Critten testified that he was trusted perfectly during the 10 years of his employment with the duties assigned to him; that he had suspected he had used liquor to excess from the fact that he was several times absent for two days; but he added that he had never seen him intoxicated, and on one occasion found, upon inquiry, that he was in fact ill. He denied that he had ever discharged him for drunkenness, though admitting that Davis had once left him, and had been taken back; and he also denied that when the thefts were discovered he had told the defendant's president, as the latter testified, that Davis was intemperate, and had been discharged for that cause. Mr. Critten stated that, if he or any member of the firm had inspected the stub book during the period of the forgeries, the discrepancies would have been discovered. The referee held upon the evidence that "the altered checks so paid by the bank are not chargeable by the bank to the plaintiffs beyond the amounts for which they were originally drawn."

Argued before VAN BRUNT, P. J., and McLAUGHLIN, RUMSEY, PATTERSON, and O'BRIEN, JJ.

George H. Yeaman, for appellant.

Benjamin N. Cardozo, for respondents.

O'BRIEN, J. The referee correctly disposed of the issues, and, were it not for the strong insistence made that the plaintiffs were guilty of such negligence as precludes their recovery, supported, as the argument is, by authorities in other jurisdictions, we should not deem it necessary to add anything to the reasons assigned by the referee for holding the defendant liable. Each side endeavored to show upon the trial that it was the negligence of the other that was responsible for the loss, it being conceded that the loss should fall on the one through whose fault or negligence the withdrawal of the money from the bank by Davis was successfully accomplished. The law which fixes the relations and rights between a bank and its depositors is well settled, and it is unnecessary to do more than state the same as summarized by the referee in his opinion in the following language:

"Money deposited in a bank becomes the property of the bank, and the bank becomes a debtor to the depositor for the amount of the deposits, and agrees to pay its indebtedness as and when demanded by the creditor. Ætna Nat. Bank v. Fourth Nat. Bank, 46 N. Y. 86; Corn Exch. Bank v. Nassau Bank, 91 N. Y. 80; Bank v. Risley, 111 U. S. 125, 4 Sup. Ct. 322, 28 L. Ed. 374. It can charge the depositor in account only with the payments made at the time, to the person, and for the amount authorized by him. Crawford v. Bank, 100 N. Y. 53, 2 N. E. 881; Shipman v. Bank, 126 N. Y. 327, 27 N. E. 371. Payments made on a check that is forged (Frank v. Bank, 84 N. Y. 209), or the indorsement of which is forged (Welsh v. Bank, 73 N. Y. 424; Shipman v. Bank, 126 N. Y. 327, 27 N. E. 371), or the amount of which is fraudulently raised (Clark v. Bank, 32 App. Div. 316, 52 N. Y. Supp. 1064; Crawford v. Bank, 100 N. Y. 53, 2 N. E. 881), are not chargeable to the depositor."

The money having been paid upon checks fraudulently raised, therefore, the defendant would be liable, unless it was able to absolve itself by showing that the plaintiffs' negligence was such as bars recovery. Upon this latter question we do not agree with the appellant that the plaintiffs were guilty of negligence in respect to the checks before they were put into the mailing drawer to be sent to the payees. The checks were prepared by Davis, payable to certain particular persons or firms to whom the plaintiffs owed bills, and each check was presented to Mr. Critten with the bill which it was intended to pay. He signed the check, and put it, with the bill, into an envelope, which he sealed, and placed in the mailing drawer. It is true that when that had been done Davis could steal the check, and, having left spaces where the amount was punched and written, could alter it; but, in the absence of some reason to suppose that the mailing drawer was to be robbed, it cannot be said that the maker of the check was called upon to take any particular pains to prevent it; and the spaces left by Davis upon the check were not such as would attract the attention of a careful man. The theft of the check by Davis, and its alteration by raising the amount as he did, and by erasing the name of the payee and substituting "Cash," were not acts for which the plaintiffs were responsible; and the payment by the bank of the checks thus raised was not excused by any negligence on the part of the plaintiffs, nor was the bank thereby discharged of its liability to the depositors for the money to their credit. While the defendant's liability does not depend on negligence (Crawford v.

Bank, 100 N. Y. 50, 2 N. E. 881), yet, as the case was tried and is now presented on the subject of the negligence of the bank, it appears that the checks showed signs of alteration. The red ink was written over the black, instead of vice versa, the punched figures were crowded and uneven, and the paper bore marks of erasure to such an extent in one instance that the cashier refused to pay without Davis' indorsement, and would not have paid many of the checks had he not known that Davis was in plaintiffs' employ. Moreover, the bank's suspicions were aroused in three instances by the large amount demanded, and at these times required Davis to indorse the checks. There is nothing to show that the plaintiffs had authorized Davis to indorse the checks, nor that he was in the habit of presenting its "cash" checks. The plain inference from this evidence is that, not only was the bank put on its guard, but that it assumed to give a personal credit to Davis, and that it was negligent in thus cashing the checks presented. It is contended, however, that there was subsequent negligence on the part of the plaintiffs which discharged the bank from its liability, or made the account rendered from time to time when Davis received the balanced bank book a stated account. In this connection the question is presented as to the duty of the depositor when his bank book, with the vouchers, is returned by the bank. The settled law of this state is that there is no duty upon the depositor to examine his bank account and vouchers thus returned to him unless he wishes to do so. That was the rule laid down in the case of Weisser's Adm'rs v. Denison, 10 N. Y. 68, and has since been asserted to be the law of this state. Shipman v. Bank, 126 N. Y. 318, 27 N. E. 371; Welsh v. Bank, 73 N. Y. 425; Bank of British North America v. Merchants' Nat. Bank, 91 N. Y. 106; Clark v. Bank, 32 App. Div. 316, 52 N. Y. Supp. 1064. The last-mentioned case was affirmed by the court of appeals (164 N. Y. 498, 58 N. E. 659), but not upon any question that is involved in the case at bar. That the return of the account with the vouchers made an account stated need not be disputed, but the effect was simply to put upon the plaintiffs the burden of showing that there was a mistake or error in the account, and the mere fact that the account was not examined did not raise any estoppel as between the plaintiffs and the bank. Shipman v. Bank, supra. But it is urged by the appellant that the plaintiffs did examine the account through their clerk, Davis, and thus became aware of the error, and that, if reasonable diligence had been exercised by the plaintiffs to advise the defendant of the fact that an altered check had been presented, no subsequent loss would have occurred. It is not disputed that Davis received the bank account and vouchers when returned; and he must be assumed to have examined the account, at which time he learned—what he already knew—that several of the checks had been altered, and that the altered checks had been paid. Can it be said, however, that Davis, in examining the account as to its correctness, acted as the agent of the plaintiffs, and that they are presumed to have the knowledge of the forged checks which Davis—being acquainted with before he examined the account, because he committed the forgeries—might again have become acquainted with upon such examination? It is quite

true that ordinarily, when an agent acts within the scope of his employment, the knowledge which he thereby acquires is the knowledge of his principal, and the principal is bound by it, although, as matter of fact, he never knew anything about it. Here, however, Davis acquired no knowledge as to these forged checks by the examination of the account. He forged the checks, and he knew all about them, and, although the examination of the account was not necessarily connected with the forging of the checks, but might have been done by any other clerk, in which case the knowledge acquired would unquestionably have been the knowledge of the plaintiffs, yet, as matter of fact, in the examination of the forged checks Davis acquired no knowledge, and it was just as much to his interest then to conceal the fact that the checks had been altered and the altered checks paid as it was to conceal that fact in the first instance before the vouchers were returned. In such a case, we think, the general rule of law as to imputed knowledge does not apply. When the agent is engaged in committing a fraud upon his principal, it is just as much to his interest to conceal the commission of the fraud and his felony after he has received the proceeds as it was before. · If, therefore, in what ordinarily would be his duty, he has an opportunity to conceal the fraud which he has committed, and which, if not concealed, would result in his detection and conviction, it cannot be said that he acts as agent of his principal in concealing the fraud which an innocent man would have discovered, and which it is for his interest to conceal. In such a case the principal cannot be charged with the presumption of knowledge. As said in Henry v. Allen, 151 N. Y. 1, 10, 45 N. E. 355, 357, 36 L. R. A. 658, 662), when an agent "is engaged in a scheme to defraud his principal, the presumption does not prevail, because he cannot in reason be presumed to have disclosed that which it was his duty to keep secret, or that which would expose and defeat his fraudulent purpose. * * * When an agent abandons the object of his agency, and acts for himself by committing a fraud for his own exclusive benefit, he ceases to act within the scope of his employment, and to that extent ceases to act as agent." And in Bienenstok v. Ammidown, 155 N. Y. 60, 49 N. E. 324,—a partnership case,—it was said:

"The principle intervenes to destroy the basis of imputed knowledge, as before observed, that a member of a firm will not be permitted, by conduct amounting to fraud upon his co-partners, to bind them as in some transaction within the sphere of the partnership. The communication of the facts concerning the transaction will not be presumed in such a case. * * * Where an agent commits an independent fraud for his own benefit, he ceases to act as an agent for his principal; and, as it is essential to the very existence or possibility of the fraud that he should conceal the real facts from the latter, the ordinary presumption of a communication between them fails. To the contrary, the presumption is that no communication was made, and consequently the principal is not affected with constructive notice."

See, also. Benedict v. Arnoux, 154 N. Y. 715, 729, 49 N. E. 326; Cave v. Cave, 15 Ch. Div. 639.

As matter of fact the plaintiffs here did not discover the fraud, nor were they ever put in a position where any innocent party could have discovered it. In this latter connection it appears that to Davis was

assigned the clerical work involved in handling the checks, and he had for years been employed and trusted. It was attempted to show that the plaintiffs were not warranted in employing him for such work. All that appears, however, is that he had absented himself at different times, and was suspected of intemperance; but that alone would not indicate or suffice to show that he would commit a crime. Having no cause to suspect or doubt his honesty, the plaintiffs were justified in intrusting to him the duty of examination of the checks. Clark v. Bank, supra.

We think, therefore, that the judgment appealed from is right, and should be affirmed, with costs. All concur, except VAN BRUNT, P. J., who dissents.

VAN BRUNT, P. J. I dissent from the conclusion of the court. None of the cases cited have ever held that, where a clerk has been specially designated by his principal to examine the bank book and vouchers as returned from the bank, and compare the same with his check book for the purpose of ascertaining whether the balance returned by the bank is correct, and errors exist which such examination would necessarily disclose, the knowledge of the clerk is not to be imputed to his principal. In the cases cited all that was held was that the knowledge of the clerk which he has acquired in the perpetration of the fraud cannot be imputed to his principal.