named plaintiffs against the said defendants trustees at the time of the commencement of the above-entitled action."

So much of said order as provides for the bringing in of the trustees as parties to said, reference, and as authorizes any provision to be made for the enforcement of the alleged lien, or directing the payment thereof by said trustees is improper. We distinctly held that, as it appeared that no moneys had been paid or agreed to be paid upon the discontinuance of the said action without the knowledge or consent of the attorney, that so far as the trustees, the defendants in the original action, were concerned there was nothing to which a lien could attach. They are, therefore, unnecessary and improper parties to this proceeding, which is allowed solely for the purpose of fixing the amount of the attorney's compensation under his contract and against his clients. Neither the trustees, individually, nor the estate in their hands, should be put to the trouble and expense of litigating this controversy. After it shall have been established what amount, if any, is due from the plaintiffs to the attorney, then he will be in a position to present his claim against the estate, and, if there is any money of the plaintiffs now or hereafter in the hands of the trustees, he may, by appropriate proceedings, collect the same.

The order, therefore, should be modified by striking out so much thereof as affects the trustees, with $10 costs and disbursements to them, and, as so modified, affirmed. All concur.

(51 Misc. Rep. 103.)

### SEABOARD NAT. BANK v. BANK OF AMERICA.

(Supreme Court, Trial Term, New York County. June, 1906.)

1. BILLS AND NOTES—INDORSEE OF DRAFT—GUARANTY OF SIGNATURES.

An indorsee of a draft indorsed it and presented it to the drawee and received payment thereon. The indorsement of the payee was a forgery. *Held*, that such indorsee was liable, his indorsement being a guaranty of the genuineness of the signatures of the antecedent indorsers.

[Ed. Note.—For cases in point, see vol. 7, Cent. Dig. Bills and Notes, § 669.]

2. SAME—DRAFT ON FICTITIOUS PAYEE.

Where a draft is drawn to the order of an existing firm which did not know of the issuance of the draft, it was not drawn to the order of a fictitious or nonexisting payee under Negotiable Instruments Law, Laws 1897, p. 724, c. 612, § 28, subd. 3, unless the drawer had no actual knowledge of the existence of such firm and his intent was to make it payable to bearer.

[Ed. Note.—For cases in point, see vol. 7, Cent. Dig. Bills and Notes, § 8.]

3. SAME—INTENT OF DRAWER.

A draft was drawn by a bank on the unauthorized request of the bookkeeper of one of its customers, to the order of a payee designated by the bookkeeper, in exchange for the forged check of such customer. *Held*, that an intent by the drawer to make it payable to bearer will not be inferred.

4. SAME—LIABILITY OF INDORSER—FORGERY.

Where a draft was drawn by a bank in exchange for a forged check, and the fact of the forgery might have been discovered by the bank by

the exercise of due care, it will not affect the liability of an indorser of the draft on his warranty of good title to the same.

Action by the Seaboard National Bank against the Bank of America, to recover on the latter's implied guaranty of the genuineness of the signatures of the antecedent indorsers of a draft.   Verdict for plaintiff.

Parker & Aaron, for plaintiff.

Stern & Rushmore, for defendant.

LEVENTRITT, J.   This case is to be disposed of on these undisputed facts:  E. V. Babcock & Co., engaged in the lumber business in the city of Pittsburg, Pa., kept an account in the Federal National Bank there located.   One H. R. Pennock, to the knowledge of the bank, was the auditor and chief bookkeeper of that firm, and had access to its checkbooks and its books generally, and, on occasions, he called at the bank with reference to certain financial matters of the firm.   On September 17, 1904, Pennock went to the bank, and, claiming to represent E. V. Babcock & Co., presented a check purporting to be a check of that firm drawn on the Federal National Bank to the order of "N. Y. Draft" for $2,000, and requested a New York draft in that sum, payable to the order of Carroll Bros.   This firm, composed of David N. Carroll and W. T. Carroll, was likewise engaged in the lumber business in Pittsburg, but the bank was not aware of its existence, or who were its individual members.   The bank complied with Pennock's request, drew on the Seaboard National Bank, the plaintiff, a draft in the sum of $2,000 in favor of "Carroll Bros.," and handed it to Pennock. Thereupon he left, and, without the knowledge of the Federal National Bank or of E. V. Babcock & Co. or of Carroll Bros., indorsed "Carroll Bros." on the draft and deposited it to his own credit in his personal account with the Mellon National Bank of Pittsburg.   That bank in its turn indorsed the draft and forwarded it for collection to the Bank of America, the defendant.   On September 23, 1904, the Bank of America secured payment from the Seaboard National Bank through the Clearing House in the usual course.   The Bank of America accounted for the proceeds to the Mellon National Bank, while the Seaboard National Bank charged the payment against the Federal National Bank in the running account between them.   The check for $2,000 which Pennock delivered to the Federal National Bank was forged, presumably by him, and it was upon the discovery of such forgery by E. V. Babcock & Co., at the close of 1904, that that firm learned of the transaction between Pennock and the Federal National Bank and of the issue of the draft.   Upon such discovery notice was given to the Federal National Bank, which had previously charged the $2,000 check against the account of E. V. Babcock & Co., and the bank then made due restitution.   By that notice the Federal National Bank first acquired knowledge of the facts which led it to suspect that the indorsement "Carroll Bros." was a forgery.   That bank thereupon promptly communicated such facts to the Mellon National Bank and to the parties to this action.   Shortly thereafter there was procured from the firm of Carroll Bros. an affidavit to the effect that the indorsement on the draft was a forgery, and that that firm had never received any benefit

either directly or indirectly from the funds collected on the draft. On January 2, 1905, the Federal National Bank made a tender of that affidavit and the draft to the Mellon National Bank and demanded restitution of the $2,000, which was refused. Prior to the discovery of the fraud which had been perpetrated, Pennock withdrew all moneys to his credit in his account with the Mellon National Bank, including the amount of the draft, and shortly thereafter he died insolvent. Upon the refusal of the Mellon National Bank, the affidavit and draft were forwarded to the plaintiff, which made a like tender to, and demand upon, the defendant, but it likewise refused to refund. The plaintiff having restored to the Federal National Bank the amount of the draft by crediting it on the account between them, brought this action. These further facts should be added: The signature of each of the three partners of E. V. Babcock & Co. was at the Federal National Bank, and the signature to the check was a forgery that could have been detected upon inspection. The firm was at no time indebted to Carroll Bros. On these facts the plaintiff submits that it is entitled to recovery, claiming broadly that the defendant could acquire only the title of the Mellon National Bank, which title failed by reason of the forged indorsement of the payee.

The defendant resists the claim principally on the ground that the draft was in effect payable to bearer; that there was no forgery in a legal sense; and that, therefore, the Mellon National Bank acquired good title. Beyond this the defendant contends that irrespective of the forgery the loss must fall on the Federal National Bank, because, through its negligence in accepting the spurious check, it became primarily responsible for the commission of the fraud so far as it affected innocent third parties dealing with the draft in good faith. These are the only questions that call for extended examination. To consider them in order:

(1) What was the nature of the draft? If in law it was equivalent to a draft payable to bearer, then through Pennock's indorsement of "Carroll Bros." the payee, the Mellon National Bank, and, through it, the defendant, acquired a good title to the draft. An instrument is payable to bearer not only when it is so expressed on its face, but also "when it is payable to the order of a fictitious or nonexisting person, and such fact was known to the person making it so payable." Neg. Inst. Law, Laws 1897, p. 724, c. 612, § 28, subd. 3. To bring the draft within the provisions of the statute the defendant maintains that in so far as the Federal National Bank was concerned Carroll Bros., unknown to it as a firm or as individuals, was nonexisting;" and, in so far as Pennock was concerned, Carroll Bros. was "fictitious," because it was a mere name arbitrarily selected by him to promote the fraudulent scheme which he had concocted, a firm that was a nonentity in the transaction, a stranger to it, and neither interested in, nor entitled to any of the proceeds of the draft. Thus the defendant deduces as a conclusion that Carroll Bros. was either "fictitious or nonexisting" to the only parties who participated in, or were aware of, the issuance of the draft. But the mere adoption of a random name for a payee would not, under the statute, make the instrument payable to bearer, and such result

would follow only provided the "person making it so payable" knew the payee named to be "fictitious or nonexisting." The defendant argues that, in the contemplation of the statute, Pennock, and not the Federal National Bank, made the draft payable to Carroll Bros.; that in its preparation the bank acted simply as a scribe, obedient to Pennock's dictation and direction; that his mind guided the bank's hand to record intention. Let us consider these propositions.

It is uniformly recognized law that negotiable paper, the payee of which does not represent a real person, cannot be deemed payable to bearer unless the paper was put into circulation by the maker with the knowledge that the name of the payee does not represent a real person. The fictitiousness of the payee and the knowledge of the maker must concur. Then the maker's intention as disclosed by his adoption of a fictitious payee fixes the character of the paper. Shipman v. Bank of the State of N. Y., 126 N. Y. 318, 27 N. E. 371, 12 L. R. A. 791, 22 Am. St. Rep. 821; Turnbull v. Bowyer, 40 N. Y. 456, 100 Am. Dec. 523; Irving Nat. Bank v. Alley, 79 N. Y. 536; Vaghano v. Bank of England, L. R. 22 Q. B. D. 103; Armstrong v. Pomeroy, 46 Ohio St. 512, 22 N. E. 866, 6 L. R. A. 625, 15 Am. St. Rep. 655; Gibson v. Minet, 1 H. Black. 569. But can it be said that Carroll Bros. was nonexistent merely because the Federal National Bank was ignorant of the existence of that concern? Ignorance of existence is not the equivalent of knowledge of nonexistence. Carroll Bros. was a real concern, though the bank did not know it. Conceding that conclusion, the defendant argues, in effect, that ignorance of the existence of Carroll Bros. precludes the possibility of any intention on the part of the bank that that firm should enjoy the proceeds of the draft; that if any intention so utterly colorless and purposeless could be conceived it is of no consequence; that Pennock was, in effect, the maker as he was the author of the draft; that it was his intention that the name Carroll Bros. should represent a fictitious payee, and that that intention is controlling and should prevail. That argument ignores the statute, which constitutes the intention of the maker the test, and not that of any person to whose dictation the maker submits. It also ignores the essential fact that the draft is the obligation of the bank, and that to allow the argument would enable any person to change the legal effect of the act of the obligor.

There are many precedents for the conclusion that the drawer of a negotiable instrument is liable to the drawee if payment be made to a person not made as payee. Where the drawer of a check, draft, or bill of exchange delivers it to an impostor, supposing him to be the person whose name he has assumed, the drawer must, as against the drawee or a bona fide holder for value, bear the loss where the impostor obtains payment of or negotiates the draft. The underlying reason is that it was the drawer's intention that the person to whom the instrument was delivered should be the payee, even though through fraud and imposition that intention was created. Though the victim of deception practiced by the person who adopted the name of the payee, the maker must honor the paper. Land Title & Trust Co. v. Northwestern National Bank, 196 Pa. 230, 46 Atl. 420, 50 L. R. A. 75; United

States v. National Exchange Bank (C. C.) 45 Fed. 163; Levy v. Bank of America, 24 La. Ann. 220, 13 Am. Rep. 124; Electrical Const. Co. v. Globe Sav. Bank, 64 Ill. App. 225. Under such circumstances the intention of the maker of the instrument controls, and casts upon him the consequences of the imposition. It is because the drawee has acted in accordance with the drawer's indicated intention that the latter must make reimbursement. It is scarcely conceivable that if, under such conditions, the maker's intention is vital to involve him in liability, that under other conditions, where liability would not follow, such intention is immaterial, and must give place to the intention of a third person, here the impostor.

Let us assume that Pennock, as a stranger, had called at the Federal National Bank, had represented himself to be a member of the firm of Carroll Bros., and as such had requested the draft in suit, and the bank, believing the representation of Pennock to be true, had drawn the draft in the form in which it appears and delivered it to Pennock, then Pennock's indorsement of Carroll Bros. would have made the Federal National Bank answerable because its intention had been effectuated. But the facts are otherwise. Pennock was known to the bank; he claimed to represent his employers, E. V. Babcock & Co., and in their behalf applied for a draft in favor of Carroll Bros. as payee. He made no pretense whatever to be a member of that firm, or in anywise to be entitled as payee to the proceeds of the draft. The imposition which he practiced did not relate to his own identity. Nothing transpired which could have given rise to an intention on the part of the bank that Pennock should become the payee. The delivery to him of the draft did not import any intention on the part of the bank that he should reap the proceeds. If, under the assumed conditions, the bank is to be mulcted as a result of its intention, is it also to be mulcted under the actual conditions where a contrary intention existed? If so, the intention of the maker, which the courts have uniformly accepted as the controlling element, could be eliminated, as his liability would attach whatever his intention. In my opinion, the intention of the Federal National Bank, to the exclusion of any design of Pennock, is the controlling consideration. The bank intended to issue, as in form it did, a draft to order, and not to bearer, and handed it to Pennock, not as owner, but for delivery to E. V. Babcock & Co. or to Carroll Bros. His indorsement of Carroll Bros. was a forgery. He had no title to the draft; he could convey none. The Mellon National Bank cashed the draft in reliance on his implied warranty of title; having taken that risk, it cannot complain if it must bear the consequences of its misplaced reliance and restore to the defendant the remitted proceeds of a draft to which it did not give the defendant good title.

(2) To turn now to the plea of negligence. The Federal National Bank was certainly negligent in accepting the forged check of its depositor E. V. Babcock & Co., whose signature it was bound to, and actually did, know. The dissimilarity between the genuine and the spurious signatures could have been detected on inspection. But does that negligence defeat the right of the Federal National Bank to reclaim the money upon discovery of the forgery and the consequent mistake in

making the payment? I think not. The negligence was unrelated to the cashing of the draft by the Mellon National Bank. The careless acceptance of the forged check did not affect or influence the conduct of that bank in permitting Pennock to utilize the draft. The negligence of the Federal National Bank was not the proximate cause of the Mellon National Bank's loss. That resulted from misplaced confidence in the integrity of Pennock, and mistaken reliance on his implied warranty of title to the draft. The Mellon National Bank was ignorant of, and in no wise concerned in, the consideration, if any, received by the Federal National Bank. The latted owed the former no duty to inspect or examine the check, and where there is no doubt there can be no breach of duty. Nothing which the Federal National Bank did or omitted was calculated to mislead the Mellon National Bank. There is no estoppel because essential elements of estoppel are missing. There was no false representation or concealment; there was no breach of duty; nothing was said or done by the Federal National Bank to mislead or deceive or to prevent inquiry as to the validity of the indorsement of Carroll Bros. No comfort can be derived from the claim that the plaintiff's reimbursement of the Federal National Bank was voluntary, and that it might have resisted repayment on the ground of negligence. The draft in controversy was issued by one bank to another. Such a draft is a check, and the parties thereto are subject to the same liabilities and possess the same rights as though the draft was drawn upon a particular bank by an individual. Suppose such individual depositor should draw his check on the bank in favor of a payee from whom he had accepted counterfeit money in exchange for the check, could the bank successfully defend a suit for the unauthorized payment of the check on a forged indorsement because of the depositor's negligence in accepting the counterfeit money for his check? The question answers itself.

In the case at bar the negligence was not only unrelated to the cashing of the draft, but it may well be said to be unrelated to the issuance of the draft. So long as the bank acted in good faith it had the right to issue the draft against any check it might see fit to accept. For its negligence in accepting the check it must answer to the drawer, and has so answered. But it had the right to rely on its direction that the draft would be paid to order, and any negligence in accepting the check has, in law, nothing to do with that direction. It follows that the plaintiff's motion for a verdict should be granted.